630 S.E.2d 836 (2006)
279 Ga. App. 213
In the Interest of C.J., a child.
No. A06A0196.
Court of Appeals of Georgia.
May 5, 2006.
*837 Rita F. Cooper, Springs, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, T. Michael Flinn, Atlanta, for appellee.
ANDREWS, Presiding Judge.
The mother of C.J. appeals from the juvenile court's order terminating her parental rights. She contends there was not sufficient clear and convincing evidence to terminate her rights and also contends that the juvenile court erred in considering certain expert testimony. After reviewing the record, we conclude there was no error and affirm.
"On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost." In the Interest of F.C., 248 Ga.App. 675, 549 S.E.2d 125 (2001).
So viewed, the evidence was that the Department of Family and Children Services (Department) removed C.J. from her mother's care on October 12, 2001. The child was two years old at the time and both parents were homeless and without jobs.[1]
The Department caseworker who handled C.J.'s case from December 2002, until October 2004, testified at the termination hearing that she had little contact with the mother during this period. The mother acknowledged that from October 2002, until May 2003, she neither saw nor visited C.J. The mother moved to Tennessee and told the caseworker that she did not have a car and therefore could not visit the child. The caseworker testified that there was a reunification plan in effect at the time under which the mother was to obtain stable housing and employment, submit to drug screens, visit the child, and keep the Department informed of any change of address. The Department attempted to do a home evaluation at the Tennessee address given by the mother, but was unable to do so. When the caseworker arrived at the address, the mother was not there and the home appeared to be abandoned.
*838 At some point, the mother moved to Alabama and gave the Department two different addresses there, but again the Department was unable to do an evaluation because the mother could not be found at either address. The caseworker stated that in August 2003, an economic support worker in Alabama notified her that the mother was under investigation for food stamp fraud, having claimed that C.J. and another child who was also not in her custody, were living with her. The caseworker who took over C.J.'s case in October 2004, testified that her first contact with the mother was in March 2005. The mother gave several reasons why communications from the Department may not have reached her and claimed that she tried to call people at the Department, but was unable to talk to anyone. The mother admitted that she had the name of her attorney and also had the address and phone number of the juvenile court. She also admitted to being in jail for over a month during August and September 2004.
When asked, the mother first stated that she had three children, but after being reminded, acknowledged that she actually had five, none of whom was in her custody. The mother submitted proof that she had taken negative drug screens, and that she completed parenting classes, a psychological evaluation and First PlacementBest Placement. As for visiting with the child, there was evidence that the mother had visitation twice a month at the parenting center immediately after C.J. was removed from her care, but missed several visits.
The mother testified that she had been employed since June 2004, and had been living in the same place since June 2004. Her pay stubs showed that she earned $3,200 in 2004. The mother admitted that she never paid any support for C.J., but said she had never been ordered to do so. She said that she did give her sister $250 for clothes for C.J. at one time. The mother also acknowledged that she never petitioned to have C.J. returned to her, even though she had remarried and claimed to have a home and a job.
As of August 2003, C.J. had been in four foster care homes. She was returned by three of the foster parents for disrupting the home. C.J. had also disrupted her classroom at school and had run away from her teachers. A child psychologist who evaluated C.J. determined that these problems stemmed from the child's not being able to form attachments and the disruption and instability of her home life. C.J.'s behavior became noticeably worse after visits with her mother.
However, C.J.'s school counselor testified that the child had improved noticeably since being placed with her current foster parents. She appeared to be a happy child and was doing well in school. The counselor said that C.J. calls her foster parent "mother" and the biological mother her "other mother." C.J. calls her foster father "daddy," and the foster parents intend to adopt her. The counselor also stated that C.J. told her she wanted to be adopted and live with her foster parents "forever." The counselor testified that she thought it would be very harmful for C.J. to be removed from her foster parents.
The guardian ad litem testified at the hearing and recommended termination. He noted that the mother had abandoned the child physically, emotionally, and financially. The child had not been with the mother since she was two years old and was now finally in a happy and secure home for the first time in her five years.
After hearing the evidence, the juvenile court granted the Department's petition for termination of the mother's parental rights. This appeal followed.
1. In several enumerations of error, the mother argues that there was not sufficient clear and convincing evidence to support the termination.
A juvenile court's termination of parental rights is a two-step process: The first step requires a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors are satisfied, the court must then determine whether termination of parental *839 rights is in the child's best interest, considering physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home. OCGA § 15-11-94(a), (b)(4)(A)(i)-(iv).
The mother has never disputed that C.J. is a deprived child, and the facts set out above support this finding. Moreover, because the mother has never appealed any of the juvenile court's orders finding that C.J. was deprived and extending custody, she is bound by the juvenile court's finding of deprivation. In the Interest of B.S., 265 Ga. App. 795, 797, 595 S.E.2d 607 (2004).
The next factor to be considered is whether lack of proper parental care or control is the cause of the deprivation. On this issue the court may consider certain factors which "render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94(b)(4)(B)(i). The court may also consider any physical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of another child by the parent. OCGA § 15-11-94(b)(4)(B)(v). Further,
[i]n addition to the considerations in sub-paragraph (B) of this paragraph, where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents.
OCGA § 15-11-94(b)(4)(C).
Here, there was evidence that although the mother had completed parenting classes, a psychological evaluation, and drug screens, the mother had failed to provide the Department with information as to her whereabouts so that a home evaluation could be performed; had failed to achieve financial stability; and had physically, financially, and emotionally neglected the child and her other children. Moreover, as the juvenile court held, the mother has not developed or maintained a parental bond with the child and has provided no support for the child. Accordingly, there was clear and convincing evidence that lack of proper parental care is the cause of the deprivation.
The third determination is whether the deprivation is likely to continue. In making this determination, the juvenile court may consider evidence of present parental misconduct or inability, as well as evidence of past inability. "Such an inference is appropriate, since the juvenile court is not required to reunite the children with the mother in order to obtain current evidence of deprivation or neglect." In the Interest of T.L., 279 Ga.App. 7, 16, 630 S.E.2d 154 (2006). Here, although some improvement in the mother's situation had occurred and she had fulfilled some of the requirements of the reunification plan, "[j]udging the credibility of her good intentions was a task for the juvenile court. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact. Further, this Court has held that the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." In the Interest of A.G., 253 Ga.App. 88, 90-91, 558 S.E.2d 62 (2001). Because a parent's conduct over the years is a better predictor of future conduct than a few months of partial stability, the juvenile court was authorized to infer from the evidence of past conduct that the improvements in the mother's situation were not sufficient to justify maintaining the child in limbo in hopes that the mother could, at some point in the indefinite future, provide an adequate home for C.J. See id. at 91, 558 S.E.2d 62.
There was also clear and convincing evidence that the continued deprivation would cause serious harm to the child. The same evidence discussed above was sufficient for the court to find that continued deprivation would cause serious mental and emotional *840 harm to C.J. In the Interest of A.G., supra. "[A] parent's failure to take the steps necessary to reunite with the child, and the child's need for a stable home are factors which the court should consider in finding that the child would suffer serious harm from continued deprivation." In the Interest of T.L., supra. Here, the evidence was that C.J. had not lived with her mother since the age of two and had visited with the mother only sporadically since that time. C.J. had bonded with her foster parents, called them "mother" and "daddy," had overcome past problems due to her anxiety over her lack of a stable and secure home, and the foster parents wished to adopt her. Accordingly, this was sufficient for the juvenile court to find that continued deprivation would cause harm to the child. See In the Interest of J.W.M., 273 Ga.App. 20, 23, 614 S.E.2d 163 (2005).
Finally, the evidence was also sufficient to support the juvenile court's determination under OCGA § 15-11-94(a) that, there being clear and convincing evidence of parental misconduct or inability, termination of appellant's parental rights was in the best interest of the child, considering the child's physical, mental, emotional, and moral needs, and the child's need for a secure and stable home. The same factors which showed the existence of parental misconduct or inability also supported the finding that termination of appellant's parental rights was in the child's best interest. In the Interest of J.W.M., supra at 24, 614 S.E.2d 163. Here, the court considered that C.J. was happy in her foster home, was adjusting well at school, and the foster parents wished to adopt her. This evidence was sufficient.
2. The mother also argues that the juvenile court erred in qualifying a witness as an expert when counsel laid no foundation and did not tender her as an expert. The witness in question was Jean Hogan, C.J.'s elementary school counselor. The record shows that Hogan was a licensed professional counselor. Further, as the Department points out, the mother never objected to Hogan's qualification as an expert witness. The mother did make a hearsay objection to Hogan's testimony, but has not raised that issue on appeal. Accordingly, this enumeration presents nothing for our review. See In the Interest of K.W., 262 Ga.App. 744, 748, 586 S.E.2d 423 (2003) (Where parent failed to raise issue in trial court, we will not address it for the first time on appeal.).
Judgment affirmed.
BARNES and BERNES, JJ., concur.
NOTES
[1] The father is not a party to this appeal.