A06A1563. IN THE INTEREST OF K. L. et al., children.
(634 SE2d 870)

ELLINGTON, Judge.

In April 2005, the Juvenile Court of Gordon County terminated the parental rights of the mother of four-year-old K. L. and twenty-two-month-old J. M. D.[1] The mother appeals, contending the juvenile court erred in finding that the children would be harmed by their continued deprivation. We disagree and affirm.

A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [OCGA § 15-11-94 (b) (4) (A) (i)-(iv).] If these four factors exist, then

---

[1] The court also terminated the rights of K. L.'s father and J. M. D.'s legal and putative biological fathers. The fathers are not parties to this appeal.

the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. [OCGA § 15-11-94 (a).]

In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Footnotes omitted.) *In the Interest of T. L.*, 279 Ga. App. 7, 10 (630 SE2d 154) (2006).

Viewed in this light, the record shows the following, relevant facts. K. L., a boy, was born in February 2001, and J. M. D., a girl, was born in June 2003. J. M. D. was born prematurely and had numerous health problems. She stayed in the hospital for three weeks and, when she was sent home, she was connected to an apnea monitor. On July 23, 2003, when J. M. D. had been home only a week, the Department of Family and Children Services ("DFACS") visited the mother's home to find out why J. M. D.'s apnea monitor was not operating properly. During the visit, DFACS found that the mother was not using the apnea monitor and that the home was "filthy," unsafe, and unfit for the children, with trash and broken glass on the floor. DFACS also found unexplained bruises on two-year-old K. L.'s back. DFACS removed the children, but soon returned K. L. to the mother pending a hearing. Shortly thereafter, the mother and K. L. were evicted from their home and started living in local motels. Although DFACS provided assistance to the mother, in August 2003, DFACS discovered that the mother and K. L. were living in a motel with no food. On August 20, 2003, DFACS removed K. L. and placed him in foster care. Between August 2003 and the date of the termination hearing, DFACS established reunification plans and provided substantial support to the mother in an effort to reunite her with the children.

The record further shows that the mother failed to fulfill the requirements of reunification case plans and that she neglected or was unable to meet the mental, emotional, and medical needs of the children. The mother did not have a job and lived with her parents,

who were the payees of the mother's monthly Social Security disability checks.[2] The mother refused other offers of government assistance, such as food stamps and adult protective services. Although the mother had a history of abuse of amphetamine and methamphetamine and failed drug screens, she refused to get any drug treatment. There was also evidence of drug use by others in the home. In addition, the mother missed several appointments for psychological evaluations, refused to participate in counseling, repeatedly failed to meet with the therapist who came to her home to teach her proper parenting skills, and made only minimal progress in her parenting classes. The mother also missed 18 out of 49 scheduled visitations with the children. During many of the visitations, the mother was distracted, inattentive, and disinterested in the children. The children's maternal grandmother usually attended visitation with the mother, and the two women sometimes became very hostile to one another and called each other names, such as "stupid" and "moron," in front of the children. This hostility caused K. L. to try to hide in a corner or under a table.

The record also shows that the mother is mildly mentally retarded, with a verbal I.Q. of 66 and a performance score of 70. The mother admitted that she dropped out of school after the ninth grade because she did not want to get out of bed in the morning. According to a psychologist who examined the mother in December 2003, the mother had limited functional skills, had trouble managing her stress level and her reactions to life events, and relied on others to manage her day-to-day activities. The psychologist opined that the mother would have difficulty managing herself without the "significant assistance" of others and would not be able to take care of the children without that support.

In addition to evidence of the mother's refusal or inability to fulfill the reunification requirements, the record also shows that the children have a variety of significant physical, mental, and emotional problems that require special care. K. L. suffers from, among other things, attention span difficulties, sleep disorders, extreme mood swings, anxiety, post-traumatic stress disorder, and possibly bi-polar disorder. When he was placed in foster care in 2003, he was "wild," lacked basic skills, bit himself on the arms, and beat his head against the walls and floor. He exhibited unusual aggressiveness toward

---

[2] At the time of the termination hearing, the mother was married to K. L.'s father, although he was in prison in Kentucky. Evidence at the hearing showed that the mother was in a relationship with J. M. D.'s father and that he had physically abused her.

other children and tortured small animals. At the time of the termination hearing, he was receiving counseling and occupational, physical, and speech therapy, and was on medication. Although K. L. has made good progress as a result of this treatment, one of his therapists testified that K. L. has a very strong need for security, control, and stability, and it is "crucial" for him to have a structured environment. The therapist also opined that K. L. would revert to his prior aggressive behaviors and that there would be an exacerbation of his mood instability without continued treatment and a structured, secure environment. According to the therapist, it would be difficult for a mentally disabled parent to meet K. L.'s special needs, especially if the parent also used drugs, frequently missed appointments, had problems with anger management, and refused to cooperate with DFACS.

As for J. M. D., who was born prematurely, she has significant medical problems and frequently experiences seizures. The seizure disorder requires medication three times a day, physical therapy, and regular medical care. The child's foster mother testified that she has to be careful about giving J. M. D. the seizure medicine because giving the child too much would be fatal.

Following the termination hearing, the juvenile court issued a comprehensive order in which it concluded that, based upon the evidence presented, the first three factors of OCGA § 15-11-94 were satisfied. Specifically, the court found that the children were deprived and the deprivation was caused by the mother's inability to provide proper parental care and support. Further, the court found that the mother did not show "any desire or ability to solve her own problems, and appears content to let things drag on, with her only contact [with the children] being sporadic visitation." The court also found that the mother is incapable of living on her own, that she lacks "basic survival skills," and that she is dependent on her own mother "materially, physically, [and] mentally."[3] Given these findings, the court concluded the children's deprivation was likely to continue "ad infinitum."

On appeal, the mother does not challenge the trial court's conclusions as to the first three factors under OCGA § 15-11-94 (b) (4) (A). The mother argues, however, that the termination of her parental rights should be reversed because the court failed to cite to specific evidence in its order to support the fourth factor, that the children's

---

[3] Accordingly, the court concluded that establishing a case plan to separate the mother from the maternal grandmother would be an "unrealistic and unworkable" solution.

continued deprivation will cause or is likely to cause them serious physical, mental, emotional, or moral harm. OCGA § 15-11-94 (b) (4) (A) (iv).

In concluding that the children would be harmed by their continued deprivation and that there was no need to postpone permanency for the children, the juvenile court found that the children needed "a very structured environment, with constant counseling and watchful observation. If this is not provided, the children will lack basic social functioning, and at least [K. L.] will exhibit increasing aggression that would lead him into the criminal/juvenile justice system." The court also found that the children did not benefit from visitation with the mother and that K. L. actually seemed happier when his mother failed to show up for visitation. These findings are supported by the record and demonstrate that the children would be harmed if they were removed from their current, stable environment and returned to the mother's care and control.

Moreover, the mother did not challenge the court's finding that the children's deprivation was likely to continue "ad infinitum," and the evidence supporting that finding also supports a conclusion that the children would be harmed by their continued deprivation. See *In the Interest of C. J.*, 279 Ga. App. 213, 216 (1) (630 SE2d 836) (2006) (evidence that deprivation is likely to continue may also support a finding that a child will likely suffer serious harm from that continued deprivation). As shown above, the mother was mentally, emotionally, and financially unable to manage her own life without the substantial assistance of her parents. Further, the mother was either unwilling or unable to develop necessary parenting skills when given the opportunity to do so, and there was no evidence that she would ever be able to properly care for the children and their special needs by herself. In addition, she frequently missed visitations with the children, and consistently refused to seek counseling, address her drug problem, or take the steps necessary to fulfill the other requirements for reunification.

In contrast, between August 2003 and the termination hearing, the children were in a safe and stable foster home with "very caring and nurturing" foster parents. The children's special needs were met and they made good progress while in their foster home. The evidence also showed that there is no parental bond between the mother and the children. J. M. D., who is now almost three years old, has lived with the foster parents since she was one month old, while the mother only had custody of J. M. D. for one week before DFACS placed the child in foster care. The mother admitted that J. M. D. does not know who she (the mother) is. The foster mother testified that she was interested in adopting the children, and the foster care case manager

testified that it was likely that an adoption by the foster parents would be granted if the natural parents' rights were terminated.

> A parent's repeated failure to remain drug or alcohol free, a parent's failure to take the steps necessary to reunite with the child, and the child's need for a stable home are factors which the court should consider in finding that the child would suffer serious harm from continued deprivation. . . . It is well established that children need a permanent home and are likely to suffer emotional problems if they do not have a permanent home or emotional stability.

(Footnotes omitted.) *In the Interest of T. L.*, 279 Ga. App. at 13-14 (2).[4] Further, the court is "authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm [to the child]." (Footnote omitted.) *In the Interest of A. K.*, 272 Ga. App. 429, 438 (1) (d) (612 SE2d 581) (2005). In addition, "[e]vidence of a lack of parental bond between the natural parent and child, that the child has adapted well to foster care, and that the foster parents wish to adopt will together support the juvenile court's conclusion that continued deprivation is likely to harm the child." (Citations omitted.) *In the Interest of J. W. M.*, 273 Ga. App. 20, 23 (1) (d) (614 SE2d 163) (2005).[5]

Having reviewed the record in this case, we find that there is sufficient clear and convincing evidence to support the juvenile court's conclusion that the children were likely to suffer serious harm

---

[4] Accord *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005); *In the Interest of J. S. T. S.*, 273 Ga. App. 221, 225-226 (614 SE2d 863) (2005); see also *In the Interest of J. K.*, 278 Ga. App. 564, 568 (2) (629 SE2d 529) (2006) (evidence that the mother failed to get treatment for her dependency on prescription medication, failed to undergo necessary psychological treatment, failed to cooperate in her case plan, and failed to develop or maintain a bond with her children supported a finding that the children would be harmed if they were reunited with their mother).

[5] See also *In the Interest of C. J.*, 279 Ga. App. at 216 (1) (evidence that the mother failed to take the steps necessary for reunification and that the foster parents provided the child a stable and secure home and wanted to adopt the child supported a finding that the child would be harmed by further deprivation); *In the Interest of A. K.*, 272 Ga. App. at 438 (1) (d) (evidence that a child with special needs was doing well in foster care, that the mother was unable to care for the child, and that the mother had not bonded with the child supported a finding that the child would "suffer confusion, developmental stagnation, and other serious harm if returned to the mother's custody"); cf. *In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001) (finding that there was insufficient evidence the children would be harmed if the mother's parental rights were not terminated when no one had expressed an interest in adopting the children and there was no evidence that the children's relationship with their mother was harmful, that the children were suffering in foster care, or that they would suffer without a permanent placement).

if the mother's parental rights were not terminated and the status quo was allowed to continue indefinitely.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED JULY 27, 2006.

George P. Govignon, William R. Thompson, Jr., for appellant.

Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Lorie A. Moss, for appellee.