637 S.E.2d 743 (2006)
In the Interest of M.R. et al., children.
No. A06A1059.
Court of Appeals of Georgia.
October 5, 2006.
Reconsideration Denied October 25, 2006.
*744 Paul M. Ledbetter, Jr., Law Office of Matthew Ledbetter, Jr., Covington, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, John J. Martin, Jr., Martin & McGuire, Conyers, for appellee.
MIKELL, Judge.
K.R., the biological father of M.R. and D.R.,[1] appeals the Newton County Juvenile Court's order terminating his parental rights to his children[2] and awarding custody to the Georgia Department of Human Resources. For the reasons set forth below, we affirm the termination order.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines *745 whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost. We do not weigh the evidence or determine the credibility of witnesses, but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[3]
So viewed, the evidence shows that on July 20, 2000, the Newton County Department of Family and Children Services (the "Department") filed a deprivation complaint and petition on behalf of M.R. and D.R., alleging that the children's mother tested positive for cocaine and marijuana at D.R.'s birth on July 9, 2000; that D.R. also tested positive for cocaine; that the mother had a history of cocaine and heroin abuse;[4] and that she was incarcerated at the time of D.R.'s birth. On August 1, 2000, the juvenile court entered an order, permitting appellant to retain custody pending further order, which included several conditions to which he consented, such as the development of a safety plan, that the mother would not be the sole caregiver, and that appellant would be required to participate in Al Anon meetings. On November 1, 2000, the Department filed a motion for review of the court's previous order. In an order dated November 13, 2000, the juvenile court withheld adjudication as to deprivation and permitted appellant to retain custody of the children, provided that both parents had negative drug screens. On November 16, 2000, however, the juvenile court entered a shelter care order, placing custody of the children, including M.F.,[5] in the Department.
The Department developed a reunification case plan on November 29, 2000, that required both parents to secure and maintain stable housing, maintain regular contact with the children through bi-monthly visits and weekly phone contact, provide child support, and comply with the involved agencies. The plan also required appellant to obtain and maintain reliable transportation in order to maintain steady employment and provide the Department with pay stubs evidencing his employment and receipts showing his stable housing. The mother was also required to complete a drug treatment program. On December 19, 2000, the juvenile court entered an order finding the children deprived, and the Department received temporary custody. The deprivation order was not appealed.
On January 3, 2001, appellant and the mother filed a motion for review of the court's order, stating that they were complying with the case plan goals and seeking custody of the children. A case plan addendum was added on February 2, 2001, requiring appellant and the mother to complete psychological assessments and participate in family counseling and anger management sessions. On February 13, 2001, the court granted a continuance on the parents' motion, entered a second order finding the children deprived, and ordered that custody of the children remain with the Department. On March 15, 2001, the parents dismissed their motion, acknowledging that they had not made sufficient progress on their case plan goals to proceed on a custody hearing.
On September 26, 2001, the Department filed a motion to extend custody for an additional year, which was granted, extending custody through November 14, 2002. On October 9, 2001, the Department developed a separate reunification case plan for appellant, with similar goals as the earlier plan, which was incorporated into a November 27, 2001, court order. By that time, appellant, however, had moved to Maryland. While there, he was evaluated on October 22 and 25 by Dr. Thomas J. Long, a psychologist. Dr. Long found that appellant was probably experiencing psychological difficulties and exhibited a personality disorder; that his past alcohol abuse history warranted caution; and that he *746 should consult regularly with a mental health professional.
By the time of the next hearing on February 28, 2002, appellant had lost touch with the Department. The court entered an order on March 5, 2002, finding that the children's mother had been incarcerated for approximately seven months; that appellant's location was unknown; and that he had not complied with his case plan, having visited the children only once in October since May 2001. The court concluded that legal custody of the children should remain with the Department. On March 11, 2002, the Department sought to change the permanency plan to adoption following the termination of the parents' rights. In accordance therewith, the Department prepared another reunification case plan on April 15, 2002, which was similar to the earlier plans but changed the permanency plan to nonreunification. The case plan also noted that appellant's whereabouts were still unknown and that he had left a telephone message on April 3, 2002, that the caseworker "need[ed] to make sure that he never gets his children back because he [was] going to become a drug addict[.]" In a May 29, 2002, order, the juvenile court approved the change in the permanency plan to adoption, and on July 25, 2002, entered a supplemental order incorporating the Department's April 15, 2002, case plan.
On November 14, 2002, the Department filed a deprivation petition. The court entered a 72-hour hearing order, finding the children deprived, the parents' whereabouts unknown, and that the case plan goals had not been met. The court scheduled the adjudicatory hearing for January 23, 2003. On that date, the Department developed another reunification case plan, which added the requirement that appellant become and remain alcohol and drug free, submit to random drug screens, and attend Alcoholic Anonymous/Narcotic Anonymous ("AA") meetings at least twice a week, providing proof of cooperation. Appellant was also required to inform child support enforcement of any employment or residence changes and to enroll in counseling by June 15, 2003. The juvenile court entered a third deprivation order on February 16, 2003, following the hearing, granting the Department temporary custody. That order was not appealed.
The Department developed another concurrent case plan on February 19, 2003, outlining appellant's case goals and plans, which noted that appellant had completed anger management counseling on February 10 but had not attended the recommended mental health counseling. On February 26, 2003, Dr. Priscilla Faulkner, a licensed clinical psychologist, conducted a psychological and parenting evaluation of appellant. Appellant reported that he had used alcohol and drugs, had several drug-related arrests, had spent approximately three and a half months in jail, had last used drugs or alcohol on November 5, 2002, and was currently attending AA meetings. Test data revealed that appellant would likely have inconsistent parenting practices and unrealistic expectations of his children, was unstable, and tended to act impulsively and aggressively, which placed his children at extreme risk for abuse as well as neglect. Dr. Faulkner recommended a psychiatric consult, intensive individual psychotherapy, counseling or ending the parents' relationship, placing the children in a healthy home environment, and continued AA meeting attendance. Dr. Faulkner diagnosed appellant as having alcohol and substance abuse issues and a personality disorder. At the time of this evaluation, the mother was in a drug treatment program.
Both D.R. and M.R. were tested by psychometrist Laurie Patrice under the supervision of Dr. Faulkner on May 22, 2003. D.R. was found to be aggressive, oppositional, highly distractable, and functioning below age level. D.R. was diagnosed with pervasive developmental, attention deficit/hyperactivity, and oppositional defiant disorders. M.R.'s report noted that since visitation resumed, she had demonstrated regressive behaviors, such as nightmares and wetting herself, and repeatedly verbalized her fear that she would be separated from her foster mother. M.R. was diagnosed with post-traumatic stress disorder, separation anxiety, and phonological disorder. The reports indicated that both children needed consistent nurturing within a safe and consistent home environment; that M.R. would be devastated for *747 the rest of her life if removed from her foster parents; and that M.R.'s visitation with her parents should be stopped if she were not going to be transitioned back into their home.
On July 23, 2003, the Department filed a petition for termination of parental rights. The Fayette County Department of Family and Children Services ("DFCS") conducted a home evaluation on August 4, 2003, and reported concerns regarding appellant's history of substance abuse and domestic violence, concluding that a predisposed risk existed regarding the future safety and stability of the children. Despite its concerns, Fayette County DFCS also reported that the parents' current lifestyle would be safe for their children, that appellant loved and wanted his children returned to him, maintained a stable home and employment, and was implementing positive parenting skills. However, the report also stated that if the children were returned to the parents, the Department would need to undertake constant monitoring to ensure proper adjustment. Subsequently, additional case plans were developed, which outlined goals similar to those in earlier case plans.
The hearing on the petition to terminate parental rights commenced on October 9, 2003, and continued on October 31, 2003, and November 6, 2003. At the conclusion of the hearing on November 6, 2003, the parents requested longer visitation, and the court instructed the Department to comply with their request. The hearing resumed on February 12, 2004, and concluded on February 13, 2004.
At the hearing on October 9, 2003, Nora Allen, the caseworker from November 16, 2000, to September 2001, testified that she established the first reunification case plan, which required appellant to maintain reliable transportation and stable housing, have regular contact with the children, make child support payments, and comply with the Department. The plan was amended in February 2001 to address the parents' emotional and mental health needs. Appellant did not meet these goals. Allen testified about the parents' relationship, stating that they separated at some point but reunited between January and May 2001. In June 2001, they separated again, and in July 2001, appellant was incarcerated for theft. In August 2001, appellant moved to Maryland.
Margaretta Shaw, the caseworker assigned to the case from September 2001 until May 2002, testified that at the time she began working on the case, the mother was incarcerated and appellant had just moved to Maryland; that the Department requested a home evaluation of appellant's parents' residence; and that Maryland did not recommend placement of the children with appellant because he had left the state and his mother believed he was using drugs again. Shaw further testified that on April 3, 2002, appellant left a message stating that he could not get his children because he was going to become a drug addict. Shaw had no further contact with appellant. On cross-examination, she recalled that appellant visited with the children twice between May and October 2001, had telephone contact with them between October 2001 and February 2002, but had no contact with them from February until April 2002. Also, he did not fully meet any of the other case plan goals, except undergoing a psychological assessment.
Jacqueline Nickens, the caseworker from June 2002 until June 2003, testified that her initial contact with appellant occurred on June 26, 2002, after he returned to Georgia; that she scheduled a visit to occur on July 9, which was D.R.'s birthday, which appellant did not attend or call to cancel; that he did not attend any visits during the year that she was involved with the case; that during that time she received confirmation that appellant completed a housing program that had a substance abuse component and submitted for drug screens; and that she had five different telephone numbers and three different addresses for the parents while she was assigned to the case. Nickens also testified that appellant had previously expressed a desire not to be involved with M.R. and D.R. and an inability to take care of them; however, he said he was "high" and using "all kinds of drugs" when he made the statement. Nickens further testified that the parents visited with the children in January and February 2003; that the visits were very "troubling" *748 for the children because the children did not want their foster parents to leave and the parents were unable to manage them; that the children were very bonded with their foster family; that the foster mother remained in the room on one of the visits because the children would not stay in the room without her; that neither child recognized their parents; and that they began regressing developmentally after visitation began.
On cross-examination, Nickens testified that appellant entered a drug rehabilitation program on November 7, 2002, from which he graduated on January 5, 2003; that appellant became gainfully employed on December 23, 2002, and provided verification of employment in the form of check stubs; that appellant provided proof of insurance on his vehicles; and that by January 2003, both parents were actively working toward completing their case plans, though they were not paying child support or obtaining counseling, as required.
Joan Chambers, the children's current case manager, testified that she received the case after Nickens; that appellant and the children's mother had resided together since September 2003; that the Department continued to be concerned about substance abuse even though both parents had completed treatment because of their history of relapses, anger, and domestic violence; that during a telephone conversation on July 2, 2003, appellant yelled and cursed at her because child support was taken out of his paycheck; that the parents argued with her on July 3, 2003, when she requested a drug screen; that appellant and the children's mother also yelled at and hit each other in September 2003, after missing a visit; and that appellant engaged in aggressive play with the children during visits and found their aggressive and destructive behavior to be "very humorous."
Chambers expressed concerns regarding the parents' ability to identify the children's special needs. She explained that the children would require intensive therapy because they were developmentally delayed, but appellant simply thought that they would adjust. She also opined that she did not think the children would ever totally adjust to being returned to appellant's custody. Regarding the case plan goals, Chambers testified that she had not received any verification that appellant had valid insurance or a driver's license; that she was aware that appellant had moved into a new home in March 2003, but he had not provided verification of his rent and utility payments; that appellant had been employed since December 2002, but had not submitted verification of employment since July 2003 and had not told his employer about his involvement with the Department; that appellant was in counseling; and that prior to the entry of a child support order against appellant in April 2003, he had not provided any child support. With regard to case plan compliance, Chambers testified that appellant and the children's mother needed to continue to pay child support for the arrearage, learn more appropriate parenting skills, maintain adequate transportation, housing, and employment, attend counseling, demonstrate an ability to live substance abuse and violence free, and learn to identify the children's needs. At the time of her testimony, Chambers admitted that there was no problem with appellant's housing or income and that appellant had remained drug free.
Judith Mae Streeper, appellant's mother, testified that appellant stayed with her in Maryland for about seven months between 2001 and 2002, during which time he had problems with alcohol abuse and made no efforts toward sobriety; that he requested that Maryland Social Services consider their home as a placement resource, which was approved but then he abruptly left before the process could be completed; and that she wrote a letter to the children's foster parents via the Department on July 6, 2001, stating that the children would "have a better life with a couple better equipped to raise them." Her opinion had changed by the time of the hearing, however, and she thought the children should be returned to appellant.
Dr. Faulkner's testimony at trial was consistent with the findings she reported in her evaluations of appellant and the children. Dr. Faulkner testified that she had observed the majority of the visits between the children *749 and the parents; that D.R. was violent and had picked up his 18-month old sister by the head and dropped her;[6] that appellant attempted to discipline D.R. but was unsuccessful; and that D.R. would require regular therapy to address his special needs and would need to be placed in an emotional behavior disorder classroom. Faulkner also testified that M.R.'s problems were directly related to the resumption of visits with her biological parents. Faulkner concluded that in light of the parents' own psychological problems, the children would be extremely difficult to parent; that appellant would have a difficult time dealing with D.R.'s aggression due to his own anger management issues; that without permanency, the children would be at risk for further emotional problems and substance abuse; that the children should remain in their current foster home because they were extremely attached to the foster parents and would be devastated if removed; and that there was a "fairly slim chance" that appellant could parent the children successfully.
Appellant testified that on November 5, 2002, he went to the Clayton Center and was informed that he needed inpatient therapy; that he graduated from a drug treatment program, which he started on November 7, 2002; that he found employment in construction in December and was still employed with the same company at the time of trial; that he has been paying weekly child support of $139.50 since the child support order was entered in April or May 2003; that he had joined church since becoming sober, regularly attended meetings, and has a support group; that Fayette County DFCS had given him full custody of one of his younger children and physical custody of another; and that he successfully completed anger management classes at the Clayton Center.
Appellant further testified that he last used drugs fifteen months and nine days ago; that he has read about children with special needs due to the presence of cocaine in their systems at birth; and that he would not allow the children's mother to live with him again unless she became sober, but he had no plans to file for divorce or reunite with her; that she showed up at his home one day when he had all four children at the house and that he refused to allow her contact with the children; and that he would do whatever Fayette County DFCS advised him to do pertaining to her.
On cross-examination, appellant admitted that the children were initially placed in foster care because their mother had been their primary caretaker despite the court order that the children not be left in her unsupervised care; that prior to moving to Maryland, he was abusing alcohol and was evicted from his residence; that between April 2001 and January 2003, he did not have any visits with the children; that he reunited with the children's mother after he returned from Maryland once she was released from prison; that a week or so before the conclusion of the hearing, the mother relapsed, and he told her to leave the house; that before the relapse, the mother had taken the children who were in his custody out of the house overnight to a relative's house; that he knew she was relapsing before it occurred but did not take any action to make her deal with her problem; that he believed families should work through their problems instead of divorcing; and that he would continue to provide emotional support to the children's mother through her work toward sobriety though she could not live with him until she was sober.
The guardian ad litem did not testify at trial but submitted his written closing argument for the court's consideration. In his statement, he acknowledged that appellant had completed his case plan and had been in recovery for more than a year and stated that it appeared that the Department had not met its burden as to appellant. However, he also opined that it was in the best interests of the children to terminate appellant's rights so that the children could be adopted. He stated that the children had a stable life in foster care and that returning the children to either parent would be detrimental to them.
*750 The juvenile court entered an order terminating appellant's parental rights on August 18, 2004, from which appellant appeals.
Before terminating parental rights, a juvenile court must employ a two-prong test.[7] First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[8] "In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child."[9] Raising two enumerations of error, appellant argues that the trial court's findings that the children were deprived and that their deprivation was likely to continue were not supported by clear and convincing evidence and that the trial court failed to make a finding that the deprivation was likely to cause serious physical, mental, emotional, or moral harm to the child. We affirm.
1. Appellant maintains that there was no clear and convincing evidence that the children were deprived and that the deprivation was likely to continue.
The juvenile court entered orders finding that M.R. and D.R. were deprived on December 19, 2000, February 13, 2001, and on February 10, 2003. Appellant did not appeal these orders. "Therefore, [he] is bound by this finding of deprivation and the first factor is satisfied."[10]
"[I]n determining whether the children's deprivation is likely to continue, the juvenile court may consider the parent's past conduct. Furthermore, the decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[11] The court is not required to reunite M.R. and D.R. with their father in order to obtain current evidence of neglect or deprivation.[12]
Although appellant's post-November 2002 "efforts to comply with the case plan and improve [himself] are laudable, the juvenile court, not this court, determines whether a parent's conduct warrants hope of rehabilitation, and it also judges the credibility of appellant's good intentions."[13] We find that the evidence supports the juvenile court's findings.
The court was authorized to conclude that appellant's conduct over the years was a better predictor of future conduct than his recent improvements.[14] The record shows that from the beginning of the Department's involvement in this case in July 2000, until November 2002, appellant made no significant efforts to comply with the case plan goals. He did not address his substance abuse issues, support or maintain contact with the children, or obtain stable housing and employment. Even after appellant began working in December 2002, he did not pay child support until ordered to do so by the court. The juvenile court concluded that the children's deprivation would likely continue because despite the father's progress, his *751 "long-standing commitment to an un[-]rehabilitated, drug-addicted wife and the mother of the children" was the best indicator of what the future would hold in terms of whether appellant would keep the mother away from the children. The court cited as an example appellant's attempts to have his parents' home approved for placement and his acknowledgment that he "blew it" by suddenly returning to Georgia, after the home had been approved, to resume his relationship with the mother and failing to contact the Department for months thereafter. The court concluded that appellant would not comply with a court order to keep the mother away from the children based on the evidence that he had violated such an order in the past, which resulted in him first losing custody of the children in November 2000. The court also noted that it simply was not persuaded by appellant's argument that his priorities had changed due to the manner in which he handled the mother's relapse that occurred the week before the conclusion of the hearing. In sum, the court concluded that the evidence was indicative of the fact that appellant would place the needs of the mother over the welfare of the children, which would ultimately cause the continued deprivation of the children.
2. In his second enumerated error, appellant argues that the trial court failed to make the required finding that the continued deprivation will cause or is likely to cause serious physical, emotional, mental, or moral harm to the children. Although appellant does not challenge the sufficiency of the evidence as to this prong of the test, we have held that
[t]he same circumstances that authorized the juvenile court's determination that [the children were] deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child[ren].[15]
The juvenile court entered a lengthy order explicitly outlining its findings of facts, which support a finding of harm if the children are returned to appellant. Additionally, Dr. Faulkner's testimony as well as that of the guardian ad litem support the finding that the children would suffer harm if returned to their parents. The fact that the juvenile court did not use the exact words set forth in the statute regarding harm does not nullify the evidence presented in the case, warranting the affirmance of the juvenile court's order.
Judgment affirmed.
BLACKBURN, P.J., and ADAMS, J., concur.
NOTES
[1] The children are seven and six years old, respectively.
[2] The order also terminates the rights of the children's biological mother, but she is not a party to this appeal. The mother appealed the termination of her rights in Case No. A06A1058, the record of which we cite to in this appeal, but her appeal was dismissed.
[3] (Footnotes omitted.) In the Interest of F.C., 248 Ga.App. 675, 549 S.E.2d 125 (2001).
[4] Included in the record was a substance abuse evaluation of the mother in which she admitted to a long history of abuse of various narcotics, starting at age 11 when she used heroin.
[5] M.F., who was six years old when the order was entered, was the mother's biological child and appellant's stepdaughter.
[6] The baby, whose initials are also M.R., was in the custody of the Walton County Department of Family and Children Services, and initially attended visits with M.R. and D.R. until the Walton County Department concluded that D.R.'s behavior endangered the baby's health.
[7] OCGA § 15-11-94(a); In the Interest of C.F., 251 Ga.App. 708, 711, 555 S.E.2d 81 (2001).
[8] OCGA § 15-11-94(b)(4)(A)(i)-(iv); In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997).
[9] (Citation omitted.) In the Interest of S.B., 237 Ga.App. 692, 693, 515 S.E.2d 209 (1999). Accord In the Interest of R.N., supra.
[10] (Citations omitted.) In the Interest of E.C., 225 Ga.App. 12, 15, 482 S.E.2d 522 (1997). See also In the Interest of J.M.D., 221 Ga.App. 556, 558, 472 S.E.2d 123 (1996).
[11] (Punctuation and footnotes omitted.) In the Interest of F.C., supra at 678(1), 549 S.E.2d 125. See also In the Interest of C.W.D., 232 Ga.App. 200, 204(1), 501 S.E.2d 232 (1998).
[12] In the Interest of E.C., supra at 16, 482 S.E.2d 522.
[13] (Footnotes omitted.) In the Interest of K.A.S., 279 Ga.App. 643, 650(1)(b), 632 S.E.2d 433 (2006).
[14] See In the Interest of D.E., 269 Ga.App. 753, 755(1), 605 S.E.2d 394 (2004). See also In the Interest of C.J., 279 Ga.App. 213, 217(1), 630 S.E.2d 836 (2006).
[15] (Footnote omitted.) In the Interest of B.I.F., 264 Ga.App. 777, 780(1), 592 S.E.2d 441 (2003).