667 S.E.2d 662 (2008)
In the Interest of A.G. et al., children (two cases).
Nos. A08A0942, A08A1152.
Court of Appeals of Georgia.
September 4, 2008.
*663 Jerry F. Pittman, Douglasville, for appellant (case no. A08A0942).
Graylin C. Ward, Newnan, for appellant (case no. A08A1152).
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Kathryn Ann Fox, Assistant Attorney General, Hunnicutt & Taylor, Linda B. Taylor, Newnan, for appellee.
RUFFIN, Presiding Judge.
The parents of A.G., R.G., M.G., and M.G. appeal from the juvenile court's order terminating their parental rights. In Case No. A08A0942, the mother challenges the sufficiency of the evidence. In Case No. A08A1152, the father contends that the juvenile court erred in failing to find a relative placement for the children after terminating the parents' parental rights. Both parents allege that the trial court erred in failing to make and file findings of fact and conclusions of law as required by OCGA § 15-11-54. Because these cases involve the same facts, we have consolidated them for appeal. For the reasons set forth below, we affirm in both cases.
We review an order terminating parental rights in a light favorable to the juvenile court's ruling to determine whether the finder of fact could have found by clear and convincing evidence that the parents' rights to custody should be terminated.[1] In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[2]
Viewed in this manner, the record shows that in December 2004, six-year-old A.G., four-year-old R.G., and three-year-old M.T.G. entered the custody of the Department of Family and Children Services ("DFCS") based on allegations of domestic violence, illegal drug use in the home, unsanitary living conditions, lack of heat in the home, and A.G.'s excessive school tardiness and absences. Thereafter, the children were apparently returned to the parents.
In July 2005, the father was charged with entering an automobile with the intent to commit theft; he pled guilty to theft by taking and was sentenced to one year of probation. The parties' youngest child, M.B.G., was born in August 2005. Approximately four months later, the mother received several traffic citations, including one for failure to have the children properly restrained in the vehicle, and she was arrested and charged with battery, assault, and obstructing a law enforcement officer. She pled guilty to battery and was sentenced to 12 months probation.
On December 18, 2005, the juvenile court placed all four children in DFCS's custody, finding that the "mother has anger issues and [the] safety of the children is at risk."[3] The children were placed with their maternal grandfather, pending a home evaluation.[4] In February 2006, the juvenile court entered an order finding the children to be deprived, noting, inter alia, that they had inadequate housing and supervision and that both parents had substance abuse problems.[5] The deprivation order was not appealed.
DFCS's reunification plan for the parents required them to successfully complete a drug/alcohol treatment program, submit to random drug screens, remain drug/alcohol free, attend and complete parenting classes, submit to a psychiatric or psychological evaluation, use nonemotionally abusive methods of interacting with the children, maintain a *664 source of income/support, and maintain suitable housing.
On March 6, 2006, the mother was charged with committing armed robbery and two counts of aggravated assault on December 29, 2005. She pled guilty to aggravated assault and robbery and was sentenced to fifteen years, with six years to serve and the balance on probation.
In April 2006, the children were placed with their paternal grandmother, Kathryn Durrough, although they remained in DFCS's custody. The children's court-appointed special advocate ("CASA") conducted a home visit of Durrough's residence. The children were not present, as they had been sent to their great-grandmother's home for the night because Durrough's electricity had been turned off. The house was cold, each room "was littered with stuff," and the CASA observed a container of plant fertilizer on the kitchen table and what appeared to be antifreeze on the kitchen floor. There was also substantial trash and a large hole in the front yard from an incomplete swimming pool excavation. Durrough told the CASA that M.B.G. was not allowed to be out of the crib unless Durrough was holding the child. After the CASA's visit, the juvenile court removed the children from Durrough's care.
In May 2007, the juvenile court entered an order changing the permanency plan from reunification to adoption based on the parents' failure to comply with their case plan, noting that the mother remained incarcerated and the father continued to test positive for drugs following his release from incarceration. The court also noted that DFCS had been unsuccessful in attempting to locate a suitable relative placement for the children.
DFCS filed a termination petition against both parents on March 5, 2007. In June 2007, the CASA filed a report with the juvenile court indicating that family visits were suspended after a January 2007 visit because of "the severity of the impact that the visit... had on [A.G.]." In August 2006, seven-year-old A.G. was hospitalized in a mental health facility. According to the CASA's report, A.G. had exhibited behavioral and emotional problems, felt the need to be the protector for his siblings, and had threatened to commit suicide. At the time of the termination hearing, A.G. was in one foster home and the other three children were in a separate foster home less than a mile away; the foster families are related to each other, and the children saw each other daily.[6] The DFCS caseworker testified that the children were "doing very well" and "ha[d] made a lot of progress," and their foster parents wanted to adopt them.
According to the DFCS caseworker, the mother completed a parenting class, but failed to provide verification that she had remained drug free, completed drug/alcohol counseling, or obtained a psychological evaluation. The mother had not paid child support for the children since they were taken into foster care. The mother testified that she would be eligible for parole in January 2008, but she had no specific plans for finding suitable housing and employment.
At the conclusion of the hearing, the juvenile court terminated the mother's and father's parental rights and awarded custody of their four children to DFCS for eventual adoption. This appeal followed.

Case No. A08A0942
1. The mother contends that there was insufficient evidence to support the termination of her parental rights.[7] We disagree.
Before terminating parental rights, a juvenile court must apply a two-step analysis:
First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, *665 mental, emotional, or moral harm to the child. In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.[8]
The mother specifically alleges that the juvenile court erred in finding that there was clear and convincing evidence that the deprivation was likely to continue. She argues that although she was incarcerated at the time of the deprivation hearing, she "made substantial progress toward her case plan while in prison," would be eligible for parole in January 2008, and was "willing to work double shifts" to support her children.
As the juvenile court noted, "while the [m]other has made some limited progress on her [case plan] by completing a parenting class and obtaining her GED, said progress has only been recent." After her children were placed in DFCS's custody based on allegations of drug use and unsuitable living conditions, the mother committed crimes that resulted in probation. At the time of the deprivation hearing, the mother was incarcerated for a robbery that she committed days after her children were taken into foster care for the second time, and she admitted that she had been drinking and had taken sleeping pills and methamphetamines before she was arrested. Although she sent two letters to the children from jail, she had not seen them since December 2005. The mother admitted at the hearing that she had no bond with two-year-old M.B.G., and that the child did not know her.
In determining whether the causes of deprivation are likely to continue, the juvenile court is authorized to consider a parent's past conduct.[9] "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact. Further, this Court has held that the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court."[10] Here, the evidence presented, including the mother's history of criminal activity, her incarceration, her robbery arrest and drug use after the children were placed in foster care for the second time, her failure to pay child support, her lack of a significant parental bond with at least one of the children, her unemployment, and her uncertainty regarding future housing and employment, authorized the juvenile court to find that the cause of the deprivation is likely to continue.[11]
2. The final termination order entered by the juvenile court was prepared by counsel for DFCS at the direction of the court. The mother argues that because the trial court did not prepare the final order, it failed to comply with OCGA § 15-11-54, which requires that "[a]fter hearing the evidence on any petition alleging deprivation, the court shall make and file its findings as to whether the child is a deprived child."[12]
The mother cites no authority for her proposition that the juvenile court must personally prepare the order, and we are aware of none. Here, the court announced its ruling at the conclusion of the hearing and then instructed DFCS to prepare a final order incorporating findings of fact and conclusions of law. The mother does not contend  and the record does not support  that the juvenile court failed to properly consider the evidence or the proposed order. The fact that the court signed the order proposed and prepared by DFCS indicates that the order adequately reflected the court's holdings.[13] "Moreover, as long as the order of the court is supported by evidence, in the absence of evidence that the court did not seriously consider proposed findings and conclusions of *666 law presented to it, no error results even if a proposed order is adopted verbatim."[14]

Case No. A08A1152
3. The father also alleges  without citation of authority  that the trial court failed to comply with OCGA § 15-11-54 because DFCS prepared the termination order. As set forth in Division 2, this enumeration presents no basis for reversal.
4. The father contends that the juvenile court erred by failing to attempt to find a relative placement for the children after termination. We find no such error.
OCGA § 15-11-103(a)(1) provides that
[i]f, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family if such a person is willing and, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child, if the court determines such placement is the most appropriate for and in the best interest of the child.
The statute does not require a juvenile court to give preference to relatives in placing children after termination of parental rights.[15] Instead, the court must, after attempting to find a suitable and willing relative, place the children with the person(s) it determines to be the most appropriate and in the children's best interests.[16]
Here, the record reflects that DFCS investigated placement with Durrough, the paternal grandmother, and found her home to be unsanitary, unsafe, and without electricity. Although Durrough later moved to a new home, DFCS rejected it as a possible placement because her husband, who lived with her, had a criminal background. The mother's sister was not approved because DFCS had cases involving her children. A paternal uncle was evaluated and rejected based on his "extensive" criminal history. DFCS also considered a paternal great-aunt for placement, but she was unwilling to take the children permanently. Finally, DFCS contacted the paternal grandfather in 2006, but he indicated that he could not care for the children then because there were other adults living in the home, he did not have adequate furniture, and he had health issues and was on disability. Although the grandfather indicated a willingness to take the children in March 2007, he also reported that his trailer was not suitable at that time. Moreover, the children are thriving and have formed bonds with their foster families, who want to adopt them. Under these circumstances, we find no abuse of discretion in the juvenile court's decision not to place the children with family members.[17]
Judgment affirmed.
ANDREWS and BERNES, JJ., concur.
NOTES
[1] See In the Interest of A.F., 283 Ga.App. 509, 510, 642 S.E.2d 148 (2007).
[2] See In the Interest of K.S.W., 233 Ga.App. 144, 147(1), 503 S.E.2d 376 (1998).
[3] At the time of the order, the father was incarcerated for drug charges and the mother had not yet resolved her criminal charges relating to the November 2005 arrest.
[4] According to the subsequent deprivation order, the children were later removed from the grandfather's home and placed in foster care after he allowed the mother to continue living in the home in violation of the safety plan.
[5] The father attended the hearing, but did not contest the allegations of the deprivation petition. The mother was not present at the hearing.
[6] A.G. was deliberately placed in a separate foster home in an attempt to remedy some of his specific problems, including his need to parent his younger siblings.
[7] The father does not challenge the sufficiency of the evidence on appeal.
[8] (Punctuation and footnote omitted). In the Interest of M.R., 282 Ga.App. 91, 99, 637 S.E.2d 743 (2006).
[9] See In the Interest of K.A.B., 285 Ga.App. 537, 541(1)(b), 646 S.E.2d 736 (2007).
[10] (Punctuation omitted.) In the Interest of C.J., 279 Ga.App. 213, 217(1), 630 S.E.2d 836 (2006).
[11] See K.A.B., supra; C.J., supra; In the Interest of J.G.-S., 279 Ga.App. 102, 103(1)(c), 630 S.E.2d 615 (2006).
[12] OCGA § 15-11-54(a).
[13] See Phillips v. Drake, 215 Ga.App. 210, 211(2), 449 S.E.2d 879 (1994) (no abuse of discretion where trial court adopts proposed order of one party in child custody dispute).
[14] Id. at 212(2), 449 S.E.2d 879.
[15] See OCGA § 15-11-103(a)(1); In the Interest of C.M., 282 Ga.App. 502, 509(5), 639 S.E.2d 323 (2006).
[16] OCGA § 15-11-103(a)(1); see C.M., supra.
[17] See C.M., supra; In the Interest of S.V., 281 Ga.App. 331, 333(2), 636 S.E.2d 80 (2006).