667 S.E.2d 176 (2008)
In the Interest of A.G. et al., Children.
No. A08A1327.
Court of Appeals of Georgia.
August 22, 2008.
*177 John G. Edwards, Valdosta, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Kathryn A. Fox, Assistant Attorney General, for appellees.
Melinda M. Katz, amicus curiae.
ELLINGTON, Judge.
The Juvenile Court of Brooks County terminated the parental rights of the mother of four-year-old A.G. and three-year-old K.G.[1] She appeals, contending there was insufficient evidence to support the court's order. For the following reasons, we affirm.
A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [OCGA § 15-11-94(b)(4)(A)(i)-(iv).] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. [OCGA § 15-11-94(a).]

*178 In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.
(Footnotes omitted.) In the Interest of T.L., 279 Ga.App. 7, 10, 630 S.E.2d 154 (2006).
Viewed in this light, the evidence shows that, in February 2004, the Brooks County Department of Family and Children Services ("DFACS") removed six-month-old A.G. from her mother's home based upon "deplorable" unsanitary and unsafe conditions in the home and the mother's on-going failure to correct the problems, even though DFACS had been providing assistance to the mother. At the time, the mother was 17 years old, unmarried, had dropped out of school at age 15 or 16 because she was pregnant, had only achieved a sixth grade education, did not have a driver's license or a car, and had no job or job training. She was living with her mother and sister, and there was a lot of hostility and fighting among the family members, which sometimes required police intervention. Following the deprivation hearing, the juvenile court found that the mother was indifferent, uncooperative, and unwilling to make an attempt to improve her situation, and that there was extreme conflict in the home between the mother and her family members. The court adjudicated A.G. as deprived and placed her in the temporary custody of DFACS for one year; the mother did not appeal that order. DFACS established a reunification plan which required the mother to complete parenting and anger management classes, work with a parent aide, complete random drug tests and substance abuse assessment, find and maintain employment and appropriate housing, provide adequate child care, and obtain her GED. DFACS continued to provide a range of services to the mother, including in-home therapy, employment assistance, GED and anger management classes, parenting classes, help with visitation and transportation, and referrals for income assistance and food stamps, among other services.
In November 2004, the court entered an order removing the mother's one-month-old son, K.G., from her home. The court found that the mother had no income, was not cooperating with DFACS, and was not complying with the reunification plan regarding A.G. The court subsequently entered a temporary custody order giving DFACS custody of K.G. In the order, the court found that the mother "is not making any attempt to seek an independent life for her and her child" and "nothing has changed since the Court's earlier removal of [A.G.,]" nine months earlier. The mother did not appeal the order.
In February 2005, the court entered an order extending temporary custody of the children with DFACS after finding that the mother had failed to make any significant progress on her case plan. In addition to the requirements of the existing case plan, the court ordered the mother to apply for public housing, submit to psychological evaluation, attend every class at DFACS, and provide clean clothes for the children.
In December 2005, the court terminated the parental rights of the children's putative father. The court did not terminate the mother's rights at that time, however, and it offered her additional time to develop parenting skills and make progress on her reunification goals. Although DFACS continued to provide a variety of services to the mother, she still failed to make any significant progress toward her reunification goals. According to a DFACS caseworker, the mother's attitude toward the assistance continued to be immature, inattentive, and uncooperative. In addition, the mother became pregnant with her third child; her son, J.G., was born in 2006.[2]
In October 2007, DFACS filed a petition to terminate the mother's parental rights to A.G. and K.G. During the termination hearing, *179 DFACS caseworkers testified that, after three and a half years of working with the mother, they had not seen her make any progress in meeting her reunification goals. The mother failed to maintain stable employment, had never worked at the same job for more than 30 days, and was unemployed with no source of income at the time of the hearing. The mother had the opportunity to enroll in a Job Corps program, which would have provided housing and transportation, job training, and GED and parenting classes, but she never showed up for the program. Although the mother was able to take GED classes elsewhere, she only attended a few classes and never obtained her GED. She failed to obtain stable housing, moving from one relative's home to another and, at one point, getting evicted from public housing. The mother rarely visited with the children, and there was no bond between them. Although A.G. knew who her mother was, she referred to her mother by her first name. As for K.G., he did not know that the woman visiting him was his mother, so he "scream[ed] and holler[ed]" during her visits.
Both children refer to their foster mother, with whom they have lived since they were placed in DFACS's custody, as their mother.[3] According to DFACS caseworkers, the children are doing extremely well in their foster home. They testified, however, that because of the children's ages, it is critical that the children have some permanency in their lives, and they warned that allowing the children to linger in foster care indefinitely would be harmful to them. Based upon her experience working with older children who had lingered in foster care, one of the caseworkers testified that such children might develop attachment issues and begin acting out, become disobedient and disrespectful, and migrate toward drugs and gang activity.
After hearing the testimony and considering the entire record, the juvenile court terminated the mother's parental rights on December 7, 2007. This appeal followed.
The mother contends that there was insufficient evidence to support termination of her parental rights, arguing that, instead, the juvenile court terminated her rights simply because "she is too immature to raise her children and failed to establish a significant parental bond." She also contends that there was no evidence to show that the children's deprivation was likely to continue, that continued deprivation would harm the children, or that termination of her rights was in the children's best interests. We disagree.
1. The evidence recounted above supports the court's finding that the children were deprived at the time of the termination hearing. OCGA §§ 15-11-2(8)(A) (defining "deprived child"); 15-11-94(b)(4)(A)(i). The mother did not appeal the previous deprivation orders, and the evidence shows that, since the court issued those orders, the mother's situation has not improved to the extent that the children are no longer deprived. See In the Interest of C.J., 279 Ga.App. 213, 216(1), 630 S.E.2d 836 (2006) (because the mother never appealed any of the juvenile court's orders finding that her child was deprived and extending custody, she is bound by the juvenile court's finding of deprivation); see also In the Interest of R.C.M., 284 Ga.App. 791, 798(III)(1), n. 6, 645 S.E.2d 363 (2007) ("OCGA § 15-11-94(b)(4)(A) requires the juvenile court to determine whether the child is a deprived childthat is, at the time of the hearing on the petition for termination of parental rightsnot whether the child has ever been a deprived child.") (punctuation omitted; emphasis in original).
2. There is also clear and convincing evidence to support the court's finding that the mother's lack of proper parental care or control is the cause of the children's deprivation. OCGA § 15-11-94(b)(4)(A)(ii). The record supports a finding that the mother's neglect of the children's needs, her failure to take the steps necessary to develop a parental bond with the children, and her failure to finish her GED, develop job skills, keep a job, and provide a safe and stable home or otherwise make significant progress on her reunification plan, despite extensive assistance from DFACS, are the reasons the children have been in foster care for almost their entire lifetimes.
*180 3. The evidence also supports the court's finding that the cause of the deprivation is likely to continue. OCGA § 15-11-94(b)(4)(A)(iii). Although the mother argues that the deprivation will not continue because she has recently made some progress on her reunification goals, her hearing testimony conflicted with the testimony of the DFACS caseworkers who have worked with the mother and the children since 2004, as recounted above. Moreover, in deciding whether the children's deprivation is likely to continue,
the juvenile court may consider evidence of present parental misconduct or inability, as well as evidence of past inability. Such an inference is appropriate, since the juvenile court is not required to reunite the children with the mother in order to obtain current evidence of deprivation or neglect. Here, although some improvement in the mother's situation had occurred ..., judging the credibility of her good intentions was a task for the juvenile court. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact. Further, this Court has held that the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court. Because a parent's conduct over the years is a better predictor of future conduct than a few months of partial stability, the juvenile court was authorized to infer from the evidence of past conduct that the improvements in the mother's situation were not sufficient to justify maintaining the child[ren] in limbo in hopes that the mother could, at some point in the indefinite future, provide an adequate home for [them].
(Citations and punctuation omitted.) In the Interest of C.J., 279 Ga.App. at 217(1), 630 S.E.2d 836. See also In the Interest of T.L., 279 Ga.App. at 10, 630 S.E.2d 154 (the juvenile court is responsible for resolving conflicts in the evidence, weighing the evidence, and judging the credibility of the witnesses).
4. There was also clear and convincing evidence to support the court's findings that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. OCGA § 15-11-94(b)(4)(A)(iv). The same evidence that supports a finding that deprivation is likely to continue may also support finding that the children will likely suffer serious harm from that continued deprivation. In the Interest of C.J., 279 Ga.App. at 217(1), 630 S.E.2d 836. Further, "[a] parent's failure to take the steps necessary to reunite with the child, and the child's need for a stable home are factors which the court should consider in finding that the child would suffer serious harm from continued deprivation." (Citation and punctuation omitted.) Id. In addition, the court is "authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to [the children]." (Footnote omitted.) In the Interest of A.K., 272 Ga.App. 429, 438(1)(d), 612 S.E.2d 581 (2005).
In this case, there was clear and convincing evidence that the children were at an age where they need to have a permanent, stable home and that they could suffer harm if allowed to linger indefinitely in foster care. The evidence also supported a finding that, despite some recent interest in improving her situation, the mother has failed to take the steps necessary to reunite with her children. Therefore, the court was authorized to find that continued deprivation would likely cause serious harm to the children. In the Interest of C.J., 279 Ga.App. at 217(1), 630 S.E.2d 836.
5. Finally, there is clear and convincing evidence to support the court's conclusion that, after considering the physical, mental, emotional and moral condition and needs of the children, including their need for a secure and stable home, termination of the mother's parental rights is in the best interests of the children. OCGA § 15-11-94(a). See In the Interest of C.J., 279 Ga. App. at 218(1), 630 S.E.2d 836 (the same factors which demonstrated the existence of parental misconduct or inability also supported a finding that termination of the appellant's parental rights was in the child's best interest). In this case, the children are bonded with their foster parents, they consider their foster mother to be their mother, *181 their foster parents wish to adopt them, and they are doing very well in the foster home. Thus, we conclude that the juvenile court did not err in finding that termination of the mother's parental rights was in the children's best interests.
Judgment affirmed.
BLACKBURN, P.J., and MILLER, J., concur.
NOTES
[1] The court terminated the parental rights of the children's putative father in December 2005.
[2] The custody of J.G. is not at issue in this case.
[3] The foster parents want to adopt both children if the mother's rights are terminated.