691 S.E.2d 292 (2010)
In the Interest of Z.H.T. et al., children.
No. A09A1900.
Court of Appeals of Georgia.
February 22, 2010.
*294 William H. Kitchens, Atlanta, for appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Senior Asst. Atty. Gen., Kathryn Ann Fox, Asst. Atty. Gen., John P. Cheeley, for appellee.
PHIPPS, Judge.
The mother of Z.H.T. and R.J. appeals the termination of her parental rights to those children, challenging the sufficiency of the evidence. Finding the evidence sufficient, we affirm.
On appeal, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.[1]
In the late evening on March 26, 2005, 12-year-old R.J. was found alone at a gas station. R.J. stated that she was afraid of her mother. She was taken into the protective custody of the Gwinnett County Department of Family and Children Services (DFCS). Based on R.J.'s allegations and facts developed at an emergency hearing, the juvenile court ordered the mother to also deliver two-year-old Z.H.T. into DFCS custody.
On April 11, 2005, the court adjudicated the children deprived. In so ruling, the *295 court found that the mother was unable to control her anger and was unable to be a "loving, nurturing and protective parent." The court cited the mother's defiance as a factor contributing to her anger problem. The court ordered the mother to cooperate with DFCS and follow all of its recommendations, including "psychological and psychiatric evaluation and treatment."
The mother's case plan for reunification, initially filed with the court in May 2005, and subsequently amended, required her to: cooperate with DFCS, maintain stable employment and housing, attend individual and family counseling sessions, attend anger management classes, attend parenting classes, undergo a psychological evaluation and follow all recommendations ensuing from that evaluation (including successfully completing any recommended courses of counseling). By 2006, however, DFCS had revised its case plan recommendation to one of nonreunification, citing the mother's persistent refusal to cooperate with DFCS and her lack of progress on other areas of her case plan. On November 7, 2006, the court ordered R.J.'s permanency plan changed to nonreunification, and on February 1, 2007, the court ordered Z.H.T.'s plan changed to nonreunification. On April 19, 2007, DFCS petitioned to terminate the mother's parental rights.
At an October 2007 termination hearing, the Gwinnett County DFCS caseworker who had worked with the mother testified that the mother had fulfilled some but not all of her case plan requirements. She had completed parenting and anger management classes but had not demonstrated in visits with her children the ability to put into practice the skills taught in those classes, and the caseworker believed that the mother needed individual counseling to learn to do so. The mother completed her psychological evaluation only after the court suspended her visits with the children until the evaluation had been done. DFCS received only limited notes of the mother's progress with that psychologist, and the mother did not supply proof that she had received individual counseling from any other source in compliance with the psychologist's recommendations. The caseworker testified that the services provided by a licensed counselor with whom the mother worked did not comply with the psychologist's recommendations. DFCS stopped paying for counseling services when the mother's case plan changed to nonreunification.
The caseworker testified that the mother did not complete family counseling; while she attended some family counseling sessions, she missed many others. The mother did not interact with R.J. in a meaningful, positive way at these sessions, but often criticized and upset the girl, ultimately leading to a suspension of their visits. The mother continued to visit with Z.H.T., with whom she showed a greater bond, but in their visits Z.H.T. often interacted more with her grandmother than with her mother.
The caseworker testified that R.J. had moved several times between foster homes and had exhibited behavioral problems. Since the mother's case plan had changed to nonreunification, however, R.J. had made progress with these behavioral problems. Z.H.T. had been in foster care more than half of her life. The caseworker testified that both girls needed permanency, stability and closure in their placement. At the time, R.J. was in a long-term foster placement with a foster mother who was committed to her and willing to work with her behavioral problems. Z.H.T. had bonded with her foster parent, as well.
The caseworker testified that the mother was not cooperative with DFCS. Although the mother signed her initial case plan, she refused to sign any subsequent case plans. She did not make any payments for support of the children. She did not provide DFCS with information verifying her employment, although she did provide a list of payments that she had received from people for various services performed. The caseworker found it difficult to get information from the mother. Sometimes the mother did not appear for a scheduled visit with the children; on one such occasion, the caseworker was unable to contact the mother because her home and cellular phones had been disconnected. Ultimately, the mother moved to Clayton County without notifying DFCS, which subsequently *296 learned of her new address in the course of a court proceeding.
The Clayton County DFCS caseworker assigned to the case after the mother's move testified that the mother refused to sign her case plan or allow Clayton County DFCS to conduct a home evaluation, which DFCS required to work on her case. Clayton County DFCS also was unable to verify with the mother her income or employment. The mother's lack of cooperation led Clayton County DFCS to close its case file on her.
A family advocate assigned to help the mother work with DFCS to regain custody of the children testified that she was not able to form a productive working relationship with the mother because the mother usually was defiant and uncooperative, would not allow the advocate into her home, cancelled visits with the advocate, and vacillated on whether to follow the advocate's recommendations regarding her case plan. The advocate also testified that she participated in visits between the mother and the children, and that at times these visits ended early because of arguments, sometimes involving yelling and screaming, between the mother and R.J. At one such visit, the advocate saw R.J. begin to cry after the mother told her that she wanted to regain custody of Z.H.T. because Z.H.T. was the younger girl.
The psychologist who evaluated the mother testified that she had Oppositional Defiant Disorder, which the psychologist defined as "[w]hen you have a law or a rule and you defy that rule, and ... don't fulfill it." The psychologist observed that the mother did not place a high priority on fulfilling her case plan requirements. The psychologist could not recommend reunification unless the mother first treated her disorder. To overcome the disorder, according to the psychologist, a person "ha[d] to come out of denial, ha[d] to be willing to acknowledge his or her own errors or faults." A standard anger management class would not adequately treat this disorder, and the psychologist testified that the mother required up to a year of individual psychotherapeutic treatment.
A licensed counselor testified that the mother completed an anger management class with him. After completion of the class, the counselor also provided a few sessions of individual counseling but stopped upon learning that DFCS would not pay for the sessions. The counselor testified to having been given minimal information about the mother's background.
R.J. told the court that she did not trust her mother, that her mother beat her and tried to choke her, and that her mother blamed her for DFCS's actions. R.J. did not want to be reunited with her mother. A clinical social worker who was counseling R.J. testified that the girl exhibited anger and oppositional defiance attributable to instability in her foster placement, and that she needed a permanent placement.
The mother testified that she disagreed with her case plans and had signed the initial plan "under protest." She asserted, however, that she had fulfilled most of her case plan requirements save for a home evaluation, which she testified she had been willing to do but DFCS had failed to conduct. She stated that she was self-employed and had moved to Clayton County in search of better housing, but did not tell DFCS of the move because she feared DFCS would attempt to sabotage her. She testified that she had tried to pay support to one of the girls' foster parents but had been told the payment could not be accepted, and that she had not been told she needed to pay support to DFCS. She testified that she had tried without success to arrange for the required individual and family counseling.
The court terminated the mother's parental rights under OCGA § 15-11-94. The court found that the mother's "home situation" had not been remedied; that she had Oppositional Defiant Disorder, which prevented her from maintaining an appropriate and healthy relationship with her children; that she had not undergone the treatment recommended by the evaluating psychologist; that the services provided by the licensed counselor did not satisfy the psychologist's recommendation; that she was unable to apply the skills taught in the anger management and parenting classes to change her behavior toward the children; that she had not engaged in "meaningful" visits with R.J. *297 but instead had caused the girl unnecessary stress during those visits; that R.J. suffered from physical and emotional abuse and needed stability that could not be found with her mother; that Z.H.T. had been "raised by the state in foster care"; that the mother had failed to pay child support and had provided no meaningful emotional or financial support to her children; that contact with their mother was upsetting and disruptive to the children; and that "[t]he continued existence of a relationship between the mother and the children [was] only going to cause the children mental, emotional, physical, and psychological harm and angst."
The court further found that the mother had failed to cooperate with DFCS, failed to provide DFCS with necessary information or allow DFCS to investigate her home, failed to sign her case plan, failed to undergo court-ordered evaluations to permit visitation to occur in the home, and failed to confirm that court-ordered counseling was occurring. The court also specifically found the mother to lack credibility.
OCGA § 15-11-94 sets forth a two-step process for terminating parental rights. The court first must determine whether there is present clear and convincing evidence of parental misconduct or inability,[2] which in turn requires a finding that (1) the child is deprived; (2) the lack of parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to the child.[3] If there is such evidence, the court must then consider whether termination of parental rights is in the best interest of the child.[4]
1. Parental Misconduct or Inability. We find that there was clear and convincing evidence to support a finding by the juvenile court of parental misconduct or inability.
(a) Deprivation. Where, as here, the children have been removed from parental custody, DFCS may prove current deprivation by showing that, if the children were returned to their mother at the time of the hearing, they would be deprived.[5] This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing.[6]
The court based its earlier finding of deprivation on the mother's failure to cooperate with DFCS, her demonstrated defiance and disrespect of authority, her inability to control her anger, and her inability to be a loving, nurturing and protective parent to her children.[7] In its termination order, the court found that these circumstances had not changed. There was clear and convincing evidence to support this finding, including the caseworkers' and family advocate's testimony that the mother continued to be uncooperative with DFCS, showed no ability to resolve her problems with R.J. through family counseling or to apply the skills learned in parenting and anger management classes in visits with the children, and failed to fulfill the recommended course of individual counseling needed to address her Oppositional Defiant Disorder. We find no merit in the mother's claim that the court impermissibly based its finding upon past rather than present deprivation; the order stated that the children remained deprived.
(b) Lack of Proper Parental Care or Control as a Cause of Deprivation. Because the children were not in their mother's custody at the time, DFCS was required to show that, if the children were returned to their mother, they would "return to a state of deprivation because of the parent's lack of *298 proper parental care or control."[8] In determining if this showing has been made,
the court shall consider, without being limited to, the following: ... A medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional or moral condition and needs of the child; ... [and][p]hysical, mental, or emotional neglect of the child or past evidence of physical, mental, or emotional neglect of the child or of another child by the parent.[9]
And where the children are not in the parent's custody,
the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: ... [t]o develop and maintain a parental bond with the child in a meaningful, supportive manner; ... [t]o provide for the care and support of the child as required by law or judicial decree; and ... [t]o comply with a court ordered plan designed to reunite the child with the parent or parents.[10]
The court received evidence that the mother's psychological condition contributed to the reasons for which the court initially found the children to be deprived. The evaluating psychologist testified that reunification was not appropriate unless the mother addressed this condition, and the evidence showed that the mother had not done so. Moreover, the evidence showed that the mother had continued to emotionally neglect R.J. And the evidence showed that for more than a year prior to the termination hearing, the mother had failed significantly to develop and maintain a meaningful parental bond with R.J., to provide for the children's support as required by law,[11] or to comply with requirements of her case plan addressing her mental health and her ability to interact appropriately with her children. This clear and convincing evidence supported the court's finding that the children's deprivation was caused by a lack of proper care or control by their mother.[12] Although the mother asserted that DFCS was at fault for these failures, the court was entitled to give more weight to the testimony of the DFCS employees on these issues.[13]
(c) Deprivation Likely to Continue. This criterion focuses on whether, as of the date of the termination hearing, the parent is likely to continue conduct causing deprivation.[14]
If over the intervening months or years since [a mother] originally lost custody of the children, the mother has not modified the behavior that led to the original and continued removal of the children, then a court [may] find that the mother will continue to so act in the future and therefore that the cause of the deprivation will likely continue.[15]
And "repeated failure to comply with case plan goals may show that the cause of deprivation is likely to continue."[16]
Although two and a half years had passed between the initial finding of deprivation and the termination hearing, the evidence showed *299 that during this time the mother had not complied with many of her case plan goals, particularly those focusing on treating her Oppositional Defiant Disorder. The mother's DFCS caseworker testified that, at the time of the hearing, the mother had neither modified the behaviors upon which the initial finding of deprivation was based nor demonstrated that she had learned the skills needed to remedy future deprivation. The family advocate testified that the mother engaged in arguments involving "yelling and screaming" with R.J. and belittled the girl during their visits, upsetting R.J. to the point that DFCS stopped the visits.
The mother argues that the deprivation will not continue because the licensed counselor from whom she had taken the anger management class believed that she could have benefitted from counseling. But "what weight to give recent improvements is a question for the trier of fact."[17] There was clear and convincing evidence to support the juvenile court's finding that the deprivation was likely to continue.[18]
(d) Continued Deprivation Likely to Cause Serious Harm.
The same evidence that supports a finding that deprivation is likely to continue may also support [a] finding that the children will likely suffer serious harm from that continued deprivation. Further, a parent's failure to take the steps necessary to reunite with the child, and the child's need for a stable home are factors which the court should consider in finding that the child would suffer serious harm from continued deprivation. In addition, the court is authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, and emotional, or moral harm to the children.[19]
The evidence showed that the mother had failed to take the necessary steps to address the cause of the deprivation and reunite with her children, and that in visits with her children the mother continued to engage in behavior that was emotionally harmful to R.J.[20] The Gwinnett County caseworker, the family advocate, and R.J.'s counselor testified about the need for permanence for the children and the adverse effect of a lack of permanence in their lives.[21] Evidence was presented that R.J. was suffering from emotional and behavioral problems attributed to the lack of permanence in her placement, and evidence was presented that Z.H.T. had spent the majority of her life in foster care. There was clear and convincing evidence authorizing the court to find that continued deprivation was likely to cause serious harm to the children.[22]
2. Best Interest of the Children. In determining whether termination of parental rights is in the best interest of the children, the juvenile court must consider their "physical, mental, emotional, and moral conditions and needs[,] ... including the need for a secure and stable home."[23] "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child[ren]'s best interest."[24]
Here, the evidence showed that the mother's continued relationship with R.J. was emotionally harmful to the girl, that R.J. suffered from emotional and behavioral problems attributable to the lack of stability and *300 permanence in her placement, that R.J.'s problems had begun to improve when her mother's case plan changed to nonreunification, that R.J. had formed a potentially long-term relationship with her foster parent, and that R.J. desired not to be reunited with her mother. The evidence further showed that Z.H.T. had been in foster care for the majority of her life and had formed a bond with her foster parent. DFCS caseworkers, the family advocate, and R.J.'s counselor testified to the children's need for permanence and stability. Although, as the mother contends, there was evidence that both girls loved their mother, based on the evidence of record we find no abuse of discretion in the court's determination that termination of the mother's parental rights was in her children's best interest.[25]
Judgment affirmed.
SMITH, P.J., and BERNES, J., concur.
NOTES
[1] In the Interest of T.J.J., 258 Ga.App. 312, 314, 574 S.E.2d 387 (2002).
[2] OCGA § 15-11-94(a).
[3] OCGA § 15-11-94(b)(4)(A).
[4] OCGA § 15-11-94(a).
[5] In the Interest of P.D.W., 296 Ga.App. 189, 191-192(1)(a), 674 S.E.2d 338 (2009).
[6] Id. at 192-193, 674 S.E.2d 338; see In the Interest of A.G., 293 Ga.App. 383, 386(1), 667 S.E.2d 176 (2008).
[7] Because the mother did not appeal the deprivation order, she is bound to the finding that at the time of the order the children were deprived for the reasons given in the order. In the Interest of P.D.W., supra at 192, 674 S.E.2d 338.
[8] Id. at 193(1)(b), 674 S.E.2d 338.
[9] OCGA § 15-11-94(b)(4)(B)(i), (v).
[10] OCGA § 15-11-94(b)(4)(C).
[11] See generally In the Interest of T.H., 290 Ga.App. 421, 425(1)(c), 659 S.E.2d 813 (2008) (Georgia law requires parent to financially support child in foster care, even in absence of court order).
[12] See In the Interest of P.D.W., supra at 194, 674 S.E.2d 338 (evidence that mother failed to pay support and achieved only some of her case plan goals supporting finding that lack of parental care caused child's deprivation).
[13] See In the Interest of A.C., 285 Ga. 829, 836(3), 686 S.E.2d 635 (2009) (it is for juvenile court to resolve conflicts in evidence, and appellate court defers to juvenile court's factfinding, weighing of evidence, and credibility determinations).
[14] In the Interest of P.D.W., supra at 194(1)(c), 674 S.E.2d 338.
[15] Id. (citation omitted).
[16] Id. (citation and punctuation omitted).
[17] In the Interest of T.H., supra at 425(1)(c), 659 S.E.2d 813 (citations and punctuation omitted).
[18] In the Interest of C.J., 279 Ga.App. 213, 217(1), 630 S.E.2d 836 (2006).
[19] In the Interest of A.G., supra at 387(4), 667 S.E.2d 176 (citations and punctuation omitted).
[20] See Divisions 1(a), (b), (c), supra.
[21] See In the Interest of T.H., supra at 426(1)(d), 659 S.E.2d 813 (court may consider adverse effects of lack of permanence in making determination that continued deprivation was likely to cause serious harm).
[22] See In the Interest of P.D.W., supra at 196, 674 S.E.2d 338; In the Interest of A.G., supra at 387(4), 667 S.E.2d 176; In the Interest of T.H., supra at 426(1)(d), 659 S.E.2d 813.
[23] OCGA § 15-11-94(a).
[24] In the Interest of R.S., 270 Ga.App. 810, 812, 608 S.E.2d 286 (2004) (punctuation and footnote omitted).
[25] See In the Interest of A.G., supra at 388(5), 667 S.E.2d 176.