Phipps, Chief Judge.
In granting a mother’s out-of-time application for discretionary appeal of the termination of her parental rights to her minor child, B. R. F., citing In the Interest of S. M. B.,[1] we asked the parties to address in their appellate briefs the question of whether this court *50 has jurisdiction to grant the out-of-time appeal. We conclude that, under the circumstances of this case, this court has jurisdiction to grant an out-of-time application for discretionary appeal from an order terminating parental rights. And for the reasons set forth herein, we affirm the trial court’s termination of the mother’s parental rights.
1. In this case, a constitutional violation concerning the appeal occurred when the mother’s right to file an application for discretionary appeal with the assistance of a court-appointed attorney was frustrated because of the ineffective assistance or denial of counsel; therefore, this court has jurisdiction to grant the out-of-time application for discretionary appeal from the order terminating the mother’s parental rights.
During the termination hearing, which began on December 5, 2012 and concluded on December 13, 2012, the mother was represented by counsel appointed pursuant to a conflict contract through the Griffin Circuit Public Defenders Office. Upon the conclusion of the hearing, the mother’s counsel sent the mother a letter in response to a call the mother had made to counsel’s office. Counsel informed the mother that it was his
under standing from the circuit Public Defender, [name] that you are not entitled to indigent defense for a discretionary appeal of a civil case (termination of parental rights). You can file a private appeal without indigent defense counsel within thirty days from the entry of final judgment. The final order should be entered within the next week. It should be noted as well that my contract with the Public Defenders Office does not include appellant [sic] work and any appeal or further action on this case would require appoint [sic] of another attorney.
Counsel further informed the mother that he was closing his file of the case, and that if she had any further questions, she should direct them to the county public defenders office. On January 14, 2013, the trial court entered an order terminating the mother’s parental rights.
The mother, acting pro se, timely filed a direct appeal from the juvenile court’s order; but the juvenile court dismissed the notice of appeal due to the mother’s failure to follow the discretionary appeals procedure.[2] On September 16, 2013, the mother, with the assistance of new counsel, filed an out-of-time application for discretionary appeal.
*51 “It is the duty of this court to raise the question of its jurisdiction in all cases in which there may be any doubt as to the existence of such jurisdiction.”[3] Pursuant to OCGA § 5-6-35 (d), an application for a discretionary appeal must be filed within 30 days of the entry of the order being appealed.[4] And an indigent parent has a statutory right to the appointment of counsel to appeal an order terminating his or her parental rights.[5]
In In the Interest of S. M. B.,[6] this court held that a trial court had no authority to grant an out-of-time discretionary appeal application from a termination of the applicant’s parental rights.[7] Citing Gable v. State,[8] the court recognized, however, that “an appellate court may, at its discretion, permit an out-of-time discretionary appeal where a constitutional right is at stake.”[9] Indeed, in Gable, the Supreme Court of Georgia held that “Georgia Courts may excuse compliance with a statutory requirement for appeal only where necessary to avoid or remedy a constitutional violation concerning the appeal.”[10]
In In the Interest of S. M. B.,[11] this court rejected the notion of correlating a parent’s right to an out-of-time appeal on ineffectiveness grounds to that of a criminal defendant.[12] The court recognized, *52 as stated by the Supreme Court of Georgia, that
[o]ut-of-time appeals are designed to address the constitutional concerns that arise when a criminal defendant is denied his first appeal of right because the counsel to which he was constitutionally entitled to assist him in that appeal was professionally deficient in not advising him to file a timely appeal and that deficiency caused prejudice. . . . However, for an out-of-time appeal to be available on the grounds of ineffective assistance of counsel, the defendant must necessarily have had the right to file a direct appeal.[13]
The court concluded that “[t]he [parent] did not have the right to file a direct appeal in this case, and so no out-of-time appeal is available on ineffective assistance grounds.”[14] In context, however, it is apparent that by “direct appeal,” the Supreme Court of Georgia meant simply a first appeal, i.e., an appeal not taken by discretionary or mandatory review “beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court.”[15]
In Gable,[16] the Supreme Court of Georgia held that “[t]here is no constitutional right to counsel, much less the effective assistance of counsel, in filing or litigating a post-conviction extraordinary motion for new trial or a discretionary application to appeal the ruling on such a motion.”[17] In Gable the remedy of an out-of-time application was not available because no violation of the defendant’s constitutional rights had occurred when counsel rendered ineffective assistance by failing to file a timely application for discretionary appeal; as in Ross v. Moffitt,[18] the defendant’s convictions in Gable had been previously affirmed on direct appeal, and the defendant had the assistance of counsel in pursuing the prior appeal.[19] The application for discretionary review in this case is not like the applications in *53 Ross or Gable, which applications had been taken for the purpose of further appellate review, following first direct appeals as of right.
In Douglas v. California,[20] the United States Supreme Court held that the Fourteenth Amendment guarantees a criminal defendant the right to counsel on his “first appeal, granted as a matter of right,”[21] and in Evitts v. Lucey,[22] the United States Supreme Court held that that right to counsel included the right to the effective assistance of counsel.[23] The rationale was that although the
Constitution does not require States to grant appeals as of right to criminal defendants seeking to review alleged trial court errors [,] ... if a State has created appellate courts as “an integral part of the... system for finally adjudicating the guilt or innocence of a defendant,” the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution.[24]
In Douglas,[25] the United States Supreme Court stated that “where the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor,” and, as to the indigent, “the right to appeal does not comport with fair procedure.”[26] “ ‘Due Process’ emphasizes fairness between the State and the individual dealing with the State[.]”[27] “[T]he phrase expresses the requirement of ‘fundamental fairness[.]’ ”[28]
In the context of termination of parental rights cases, the discretionary appeal process is the one and only first appeal as of right. First, although the United States Constitution does not require states to appoint counsel for indigent parents in termination proceedings,[29] as previously set forth, in Georgia the right to court-appointed counsel for an indigent parent in termination proceedings includes the appellate process. Second, in In the Interest of A. C.,[30] the *54 Supreme Court of Georgia said that the state has a “legitimate interest in not permitting children determined to be deprived to languish in temporary care, but instead, to leave this situation for permanent stable homes as expeditiously as possible,”[31] and that the discretionary appeal process provided in OCGA § 5-6-35 (a) (12) “helps accomplish this goal by offering effective appellate review in an expedited manner, yet permitting a full appeal of the termination of parental rights if that is shown to be warranted.”[32]
The United States Supreme Court stated:
In Lassiter, it was not disputed that state intervention to terminate the relationship between a parent and the child must be accomplished by procedures meeting the requisites of the Due Process Clause. The absence of dispute reflected this Court’s historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment.[33]
The dissenting opinion misses the mark when it focuses on whether the appeal rights in this case were granted by statute or by either the state or federal Constitution. As Justice Harlan remarked in Douglas about the due process issue: “The real question in this case, I submit, and the only one that permits of satisfactory analysis, is whether or not the state rule, as applied in this case, is consistent with the requirements of fair procedure guaranteed by the Due Process Clause.”[34] Here, the state rule was not applied consistent with the requirements of fair procedure guaranteed by the Due Process Clause.
It is evident that the Georgia legislature incorporated the discretionary application appeal procedure as an integral part of the system for finally adjudicating termination of parental rights cases, and this system, which entitles indigent parents to court-appointed counsel for appeals and provides appellate review of termination orders and a possibility for a full appeal, must be applied in accordance with the requirements of fair procedure guaranteed by the Due Process Clause of the Constitution.[35] But in this case, the system did *55 not comport with the Due Process Clause. In this case, an indigent person who desired appellate review of the decision terminating her parental rights was forced (due to the ineffective assistance of her trial counsel) to pursue her one and only first right of appellate review (and a possible full appeal) without an attorney when state law entitled her to be appointed an attorney for appeal. The parent, acting pro se, filed the wrong document in taking her appeal application to this court after her court-appointed trial attorney erroneously notified her that she had no right to court-appointed counsel for appeal.[36] As the remedy for this due process violation, we acknowledge that we have jurisdiction of the discretionary appeal and, as determined previously in granting the application, we proceed to review the appeal on the merits.[37]
2. We affirm the trial court’s termination of the mother’s parental rights.
In reviewing the sufficiency of the evidence supporting a termination order, we view the evidence in the light most favorable to DFCS and determine whether ... any rational trier of fact could have found by clear and convincing evidence that the natural parent’s rights have been lost. We do not weigh the evidence or determine the credibility of the witnesses but defer to the trial court’s factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[38]
B. R. F. was born on June 16, 2011. At the time, her mother was 17 years old (born November 23, 1993), and still living with her own father (the “grandfather”). The Department of Family and Children Services (DFCS) became concerned that the child’s needs were not *56 being met in the home, and DFCS attempted to work the case as a “family preservation ongoing case without court intervention.” But on July 19, 2011, the court entered an order for shelter care, stating therein that a complaint had been made to the court concerning the child, and that DFCS had made reasonable efforts to prevent or eliminate the need for removing the child from the home and to make it possible for the child to remain safely in the home by providing parenting services in the home to work with the mother and child for two weeks, by implementing two safety plans for supervision, and by holding family conferences and providing family preservation services. The order continued, however, that the mother had been unable to “demonstrate appropriate parenting abilities,” that the grandfather had recommended that the mother’s 18-year-old ex-boyfriend supervise the mother and child during the day, and that there was “no appropriate supervision of the mother and child in the home.” The court placed the child in the custody of the Pike County DFCS, pending a 72-hour hearing.
On July 22, 2011, the court entered a 72-hour hearing order. The court made the following findings in its order:
Based upon the evidence presented,... the Court finds that there is probable cause to believe the . . . child is deprived pursuant to OCGA § 15-11-2 (8) (A): the Mother, a minor lacks appropriate parenting skills and may have some cognitive issues which could possibly be hindering her ability to grasp and demonstrate parenting skills being taught by [the parenting services company]; the maternal grandfather has been an impediment to DFCS attempting to place aid, training, resources and services in the home to assist the Mother and Child.
Notwithstanding, the court concluded that continuation in the home would not be contrary to the welfare of the child, and that “risk” could be managed with the child in the home provided that the parties strictly complied with certain conditions. Specifically, the mother and the grandfather were required to comply with a prior safety plan, which plan required that the child reside in the home of the grandfather, that the mother be supervised at all times with the child, and that the grandfather ensure that the mother had a suitable caretaker for the mother and child at all times. The court also ordered the following in the July 22, 2011 order: the mother and child would be supervised at all times; the mother would submit to a psychological evaluation/parental fitness assessment; the mother and grandfather would provide DFCS with a list of at least three individuals over the *57 age of 21 who would be available to meet with and cooperate with DFCS and who would be available to supervise the mother and child when the grandfather was at work; the grandfather could not supervise the mother and child; the mother would attend all scheduled parenting services appointments, conferences with DFCS, and services provided by DFCS; and the grandfather would not interfere with or impede DFCS’s obligations to provide services, training, assistance, and targeted case management to the mother and child. The juvenile court sent the child home with her mother and grandfather with this order and safety plan in place.
With regard to the mother, on August 17, 2011, the court entered a “Consent Order for Shelter Care.” The court found that based on information that had been brought before it on August 16, 2011, continuation in the grandfather’s home would be contrary to the mother’s welfare. The court found that it was necessary for the mother’s protection that the mother be placed in shelter care
because [the mother] is 17 and has a 2 month old infant and needs help raising the infant; [DFCS] tried in-home parenting sessions through [a parenting services company]; however, due to some cognitive limitations, immaturity, and interference from the [grandfather]/sole legal guardian, [the mother] was unable to learn and/or demonstrate adequate parenting skills.
The order stated that the mother sought to be placed in a group home with her infant child, and the court directed that the mother be placed in a group home for teenaged mothers, pending a 72-hour hearing on September 1, 2011.
With regard to the child, the court entered a second shelter care order on August 24, 2011. The order stated that a petition had been filed and that an adjudicatory hearing had commenced on August 16, 2011. The court found that the mother was still unable to demonstrate the parenting skills taught to her by outside services, and that the grandfather had been an impediment to the services DFCS had been attempting to provide the mother. The court ordered that the child be placed in the custody of DFCS, pending the continuation of the adjudicatory hearing on September 1, 2011.
All the parties stipulated that the mother was deprived, and on August 18, 2011, the mother and her child were placed together in a “Second Chance Home” where the mother could learn to care for her child. But the mother did not want to be at the group home, the grandfather continued to interfere in the mother’s care of the child, and there was no evidence that the mother could parent the child *58 alone. On September 20, 2011, the child was placed in a foster home, where the child resided as of the date of the termination hearing.
The court entered a 31-page order on November 3,2011, nunc pro tunc to September 8, 2011, adjudicating the child deprived and awarding temporary custody to DFCS. The order stated that the matter had come before the court on August 16, 2011, September 1, 2011, and September 20, 2011 for hearings. The court adjudged the mother not deprived and released her from the custody of DFCS, as the grandfather had withdrawn his consent as to her deprivation; the mother was thus released from the group home. The order also required DFCS to prepare “concurrent permanency plans of reunification and non-reunification/live with fit and willing relatives” for the mother and father, and to set up a visitation schedule for the mother and father.[39] The court required that the mother and father comply with case plan conditions, including obtaining six months of stable housing, six months of stable income, a high school education or GED, and a psychological evaluation and parental fitness evaluation; neither parent had to pay child support provided they continued to be enrolled in school full-time. The court added that it was “paramount” that the parents not only fulfill the foregoing requirements, but that they show successful implementation of parenting skills they had been taught.
A case review hearing was held in April 2012, at which the mother testified that she did not believe that she was capable of caring for her child. At the conclusion of that hearing, the judge told the mother that he would allow her to decide whether she wanted services offered by DFCS and in which services she wanted to participate; at the time of the hearing, the mother had been receiving DFCS services from several different people, including “a therapist and a parent aide and then someone that was supervising [the mother] with visitation for parenting.” After the hearing, the mother did not participate in any services offered by DFCS; the mother did, however, continue to visit the child. Afew months later, in July 2012, the mother went to the offices of the grandfather’s attorney and, without the knowledge of her own attorney, signed documents surrendering her parental rights to the grandfather.[40] DFCS thereafter terminated the mother’s visitations with the child, and there was no further contact between DFCS and the mother. Although DFCS had initially asked for a reunification permanency plan, in July 2012, *59 DFCS requested a change to a concurrent reunification and non-reunification/adoption plan.
On September 24, 2012, DFCS filed a petition to terminate the mother’s parental rights to the child. A hearing was held over the course of several days in December 2012. At the termination hearing, a DFCS social services administrator testified that she had been involved in B. R. F.’s case since the beginning. The social services administrator testified that when the case began, the grandfather would not allow the mother to cooperate with DFCS; the grandfather did not want DFCS involved. He would not allow DFCS to speak with the mother outside the presence of her attorney, and he would tell the mother not to cooperate with the in-home parent aide or to do something contrary to what the in-home parent aide was telling the mother to do.
Concerning whether the mother had completed her case plan goals, the social services administrator testified that the mother had completed a psychological and parental fitness evaluation, but that she had not followed all the recommendations of the psychological evaluation. Specifically, the mother had not shown proof that she had followed up on a mental health diagnosis that required her to take medication, and had not shown proof that she had been seen or was being seen by a therapist. The mother had completed parenting classes, but she was unable to implement what she had been taught. The mother attended weekly scheduled visitations with her child, but there were issues with her attentiveness and her responsiveness during the visitations. For instance, the mother would send text messages on her cell phone during the entire visit, or would not be fully engaged with the child. The mother did not obtain and maintain a source of income; the mother did not obtain and maintain stable, clean and safe housing approved by DFCS; and the mother had not completed high school or a GED program. The mother had had no contact with DFCS since she had executed the surrender of parental rights documents.
The psychologist who conducted the psychological and parental fitness evaluation of the mother on August 24, 2011 wrote in his report that the mother had described her relationship with the grandfather as “amazing. I’m a daddy’s girl.” When the psychologist asked the mother what she had learned in her parenting classes and at the group home, the mother replied that she did not know. With regard to the mother’s mental health history, the mother told the psychologist that when she was 14 or 15 years old, she had taken a certain drug “for ADHD,” and that she just stopped taking it because it “wasn’t doing anything.” But the psychologist noted that the drug the mother had specified was not a medication that was commonly *60 prescribed for ADHD. The mother described her own mood as “Bitchy,” stating that that was “just my personality.”
The psychologist wrote that the mother generally came across as “extraordinarily immature, with mannerisms and speech that usually is seen in much younger children,” and that the mother gave nonsensical responses to some questions. The psychologist wrote that “in spite of [the mother’s] being coherent and reasonably articulate, [her] diction, nonverbal gestures, and overall presentation suggested the possibility of cognitive deficits.” The psychologist wrote that it was of extreme concern to him that throughout the evaluation, the mother had expressed frustration with having to care for her baby “round the clock,” noting that the child cried and that the crying kept her up at night. The mother had complained about nearly all aspects of caring for the infant child, and more than once asked whether the evaluation could be extended so that she could delay having to return to the group home and being saddled with the responsibility of caring for her child.
The psychologist reported that the mother’s IQ test results were in the average range, which seemed to indicate the absence of any cognitive or intellectual deficits that would inherently prevent her from potentially exercising adequate judgment or making sound parenting decisions, but the mother’s responses to certain questions suggested the potential for extremely poor judgment. The psychologist recommended that the mother participate in individual therapy, and obtain diagnostic clarification of mental health needs she may have. The psychologist cautioned that any plan for the mother to independently care for the child should be undertaken with “extremely high degrees of caution.”
A therapist whom the grandfather had contacted in August 2012 testified that he (the therapist) had had four sessions with the mother, and that the grandfather had accompanied the mother to the sessions. The therapist testified that it was his impression that the mother “knows she’s not ready for [parenting] and that she knows that someone else is going to be — do that [sic],” that the mother was “pretty immature” and did not “have a real good understanding... of moving toward independence,” and that in his opinion, the mother did not have the ability to care for a baby and had told him so.
At the time of the termination hearing, the mother lived with the grandfather. She testified that she had executed documents surrendering her parental rights in favor of her father (the grandfather) so that the child could “stay ... with the family,” and that she would be an “assistant person” to the grandfather, or a “big sister” to the child, but not the child’s primary caregiver. DFCS had conducted a home *61 placement evaluation of the grandfather’s home, but did not approve the home as a placement resource for B. R. F.
In rendering its judgment, the juvenile court first addressed DFCS’s contention that the mother’s voluntary surrender of her parental rights to the grandfather was invalid. At the termination hearing, DFCS argued, and the juvenile court ultimately agreed, that the mother had surrendered her rights only to avoid completing her court-ordered reunification goals and as a subterfuge to avoid the involuntary termination of her parental rights, with the hope that she could maintain control of B. R. F. through the grandfather.[41] The court continued with the termination hearing, and thereafter terminated the mother’s parental rights.
On appeal, the mother contends that a reasonable finder of fact could not have found by clear and convincing evidence that: she was the cause of the child’s deprivation for the requisite amount of time; any deprivation suffered by the child was likely to continue or likely not to be remedied; and deprivation would cause or was likely to cause serious physical, mental, or emotional harm to the child.
To prove that parental rights ought to be terminated, [DFCS] first must prove “parental misconduct or inability’ by clear and convincing evidence. [42] Such proof requires [DFCS] to establish that (1) the child is deprived; (2) the deprivation results from a lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [43]... Where [DFCS] carries this burden, it then must prove that termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home.[44]
(a) Parental Misconduct or Inability. The mother contends that a reasonable finder of fact could not have found by clear and convincing evidence that she was the cause of the child’s deprivation as *62 required pursuant to former OCGA § 15-11-94 (b) (4) (A) (ii). She asserts that the child was deprived due to the grandfather’s conduct; that DFCS did not do enough to assist her in gaining independence from the grandfather; and that there was no evidence that she had failed to comply with the reunification plan for at least a year prior to the filing of the termination petition.
(i) Deprivation. The juvenile court previously adjudicated the child to be deprived and, in the order terminating the mother’s parental rights, took judicial notice of its deprivation order. As the mother never appealed the deprivation finding, she is now bound by it.[45]
(ii) Lack of proper parental care or control caused the deprivation. The mother’s claim that a reasonable factfinder could not have found by clear and convincing evidence that she had unjustifiably failed to comply with the court’s reunification plan and that the deprivation was due to the acts and omissions of the “Mother as opposed to Grandfather” lacks merit.
Although the grandfather initially impeded the mother from cooperating with DFCS, when the mother turned 18 years old on November 23,2011, she was able to (and did) attend parenting classes offered by DFCS. Moreover, the mother attended scheduled supervised visits with the child. But in April 2012, she testified that she was not capable of taking care of B. R. F, she elected to stop receiving services DFCS offered, and shortly thereafter, she executed documents surrendering her parental rights. The mother told her therapist that she did not have the ability to care for her child, and there was ample testimony that the mother was immature and, ultimately standing alone, was not capable of mastering and utilizing the necessary skills to meet her parenting obligations.[46]
Moreover, the evidence showed that the mother did not complete her case plan. She had not followed all the recommendations of the psychological evaluation, in that she failed to show proof that she had followed up on a mental health diagnosis that required her to take medication; she had not completed high school or a GED program; she was inattentive during visits with the child; she still lived with the grandfather and had not obtained and maintained stable, clean and *63 safe housing approved by DFCS; and most importantly, the mother was unable to implement the parenting skills she had been taught.[47]
The mother complains that DFCS did not do enough to assist her in gaining independence from the grandfather. But there was no evidence that the mother, who described herself as a “daddy’s girl,” wanted to be independent of the grandfather.
Before she turned 18 years old, the mother and child were placed in a group home for teenaged mothers so that the mother could learn to care for her child. But the mother did not willingly go to the group home, and while there, she complained about parenting tasks. After the mother turned 18 years old, she testified that she wanted the grandfather to adopt B. R. F., and that she desired to live in the grandfather’s home and act as an assistant to him in caring for B. R. F, but not as the child’s primary caregiver. Moreover, in April 2012, the mother stopped participating in services provided by DFCS and declined the court’s offer to receive DFCS services; yet she later went with the grandfather to see a therapist.
The mother observes that the case plan order was entered on November 3, 2011, yet the petition to terminate her parental rights was filed less than a year later, on September 24, 2012.
Former OCGA § 15-11-94 (b) (4) (C) (iii) (2012) provided that in addition to the considerations in subparagraph (B) of OCGA § 15-11-94 (b) (4) (2012),
where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for *64 termination of parental rights ... to comply with a court ordered plan designed to reunite the child with the parent or parents [.] . . ,[48]
“[E]ven if the reunification plan has been in effect for less than one year, a termination of parental rights may be warranted by other factors.”[49] “The court should remain mindful that the time limitation in former OCGA § 15-11-94 (b) (4) (C) is designed to give the parent whose rights are subject to termination sufficient time and opportunity to demonstrate his or her ability to comply with the terms of the court’s order.”[50]
Here, despite all parenting and reunification services provided, in April 2012 the mother testified that she was not capable of caring for B. R. F., she declined further services by DFCS, and shortly thereafter, she executed surrender of parental rights documents. Once given the opportunity to reside with the child away from the grandfather and to learn parenting skills, the mother complained and sought to avoid her parental responsibilities. The mother later expressed to her therapist that she was unable to care for B. R. F., and she continued to reside with the grandfather, whose home DFCS did not approve as a placement resource for B. R. F. The mother’s actions were contrary to any desire to parent B. R. F, or to follow the court’s orders, thus obviating the need for DFCS to wait approximately six more weeks before moving to terminate her parental rights.[51]
(iii) Cause of the deprivation is likely to continue. The mother contends that a reasonable finder of fact could not have found by clear and convincing evidence that any deprivation suffered by the child was likely to continue or likely not to be remedied.
The mother testified that she was not capable of taking care of B. R. F; she told her therapist that she was unable to care for B. R. F; and the therapist testified that the mother was immature and, in his opinion, did not have the ability to care for a baby.
Here, the evidence showed that despite her good intentions, the mother has never successfully parented the [child] alone, and .. . there was more than clear and convincing evidence that the mother [was] simply not capable of fulfilling her parenting obligations. Thus, the court was entitled to infer *65 from the evidence that, despite the best efforts of [DFCS]..., the same pattern of deprivation would continue if the [child] were reunited with [her] mother.[52]
Moreover, at the time of the termination hearing, the mother resided in the grandfather’s home, from which B. R. F. had been removed in the first place, and DFCS did not approve that home as a placement resource for the child.
(iv) Continued deprivation is likely to cause harm. The mother contends that a rational trier of fact could not have found by clear and convincing evidence that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to the child.[53] The DFCS social services administrator and the psychologist testified that the child, who had been in foster care for 16 months, needed permanency, something that was unattainable in the mother’s care. The social services administrator testified to the great emotional trauma suffered by a child “in limbo.” B. R. F. had bonded with her foster parents, who wanted to adopt the child.
The juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child[ ]. Indeed, children need permanence of home and emotional stability or they are likely to suffer serious emotional problems. A caseworker’s testimony about the need for permanency may be considered. The evidence sufficed on this factor.[54]
“[T]he same facts that support a juvenile court’s conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm.”[55]
Based on the [mother’s] past behavior and [her] unwillingness and inability to comply with significant requirements of [her] case plan, we find that a rational factfinder could have *66 found by clear and convincing evidence that giving custody to [the mother] would seriously harm the child.[56]
(b) Best Interest of the Child. As for the second prong of the termination analysis, the mother does not challenge the juvenile court’s finding that termination of her parental rights was in the best interest of the child. Notwithstanding, we are persuaded that the evidence showed that termination of the mother’s parental rights was in the best interest of the child, considering the child’s physical, mental, emotional, and moral condition and “need for a secure and stable home.”[57]
“The same evidence showing parental misconduct or inability may, and here does, establish this requirement.”[58] A child needs permanency, stability, and a safe environment, which the mother cannot provide.[59] “The juvenile court was authorized to consider the [child’s] need for a stable home situation and the detrimental effects of prolonged foster care.”[60] The DFCS social services administrator and the psychologist testified that the child, who had been in foster care for more than a year, needed permanency. “Given this evidence, and having reviewed the entire record in this case, we find that there is sufficient clear and convincing evidence to support the juvenile court’s decision to terminate the mother’s parental rights.”[61]

Judgment affirmed.

Barnes, P. J., and Ellington, P. J., concur. McFadden, J., concurs fully and specially. Andrews, P. J., Ray and McMillian, JJ., dissent.

 319 Ga. App. 125 (735 SE2d 122) (2012).

 See OCGA § 5-6-35 (a) (12), (d).

 Rowland v. State, 264 Ga. 872 (1) (452 SE2d 756) (1995) (citation and punctuation omitted).

 OCGA § 5-6-35 (d).

 See former OCGA § 15-11-98 (2012), which was in effect at the time of the termination proceeding (“(a) In any proceeding for terminating parental rights or any rehearing or appeal thereon, the court shall appoint an attorney to represent the child as the child’s counsel and may appoint a separate guardian ad litem or a guardian ad litem who may be the same person as the child’s counsel, (b) If the parent or parents of the child desire to be represented by counsel but are indigent, the court shall appoint an attorney for such parent or parents ....”). See also Nix v. Dept. of Human Resources, 236 Ga. 794, 796 (225 SE2d 306) (1976) (“It is .. . quite evident that the entire legislative scheme written into the pertinent provisions of the Juvenile Code was intended to provide to an indigent parent effective representation at all stages of any proceeding involving the termination of that parent’s right to his or her child” including for appeal); Dell v. Dell, 324 Ga. App. 297, 302 (2) (748 SE2d 703) (2013) (“An indigent parent has a statutory right to effective legal representation in termination proceedings. Moreover, an indigent parent whose parental rights have been terminated is entitled to a paupered copy of the transcript for use in appealing the decision of the trial court.”) (citations and punctuation omitted); In the Interest of B. C. P., 229 Ga. App. 111, 116 (3) (493 SE2d 258) (1997) (an indigent mother is entitled to court-appointed counsel to appeal a determination of deprivation). And see former OCGA § 15-11-6 (b) (2013) (a “party is entitled to representation by legal counsel at all stages of any proceedings alleging ... deprivation, and if, as an indigent person, a party is unable to employ counsel, he or she is entitled to have the court provide counsel for him or her”).

 Supra.

 In the Interest of S. M. B., supra at 128.

 290 Ga. 81 (720 SE2d 170) (2011).

 In the Interest of S. M. B., supra at 126-127.

 Gable, supra at 85 (2) (b).

 Supra.

 In the Interest of S. M. B., supra at 127.

 Id. (quoting Stephens v. State, 291 Ga. 837 (2) (733 SE2d 266) (2012) (emphasis omitted and supplied)).

 In the Interest of S. M. B., supra.

 Douglas v. California, 372 U. S. 353, 356 (83 SCt 814, 9 LE2d 811) (1963); see Evitts v. Lucey, 469 U. S. 387, 402 (III) (B) (105 SCt 830, 83 LE2d 821) (1985), citing Ross v. Moffitt, 417 U. S. 600, 602-605, 609-612 (I), (III), (IV) (94 SCt 2437, 41 LE2d 341) (1974) (holding that, following a direct appeal of right, a criminal defendant has no constitutional right to counsel to pursue further discretionary state appeals and applications for review by the United States Supreme Court).

 Supra.

 Gable, supra at 86 (2) (c) (citations omitted).

 Supra.

 Gable, supra at 82 (1).

 Supra.

 Douglas, supra at 356 (emphasis in original).

 Supra.

 Evitts, supra at 392, 404 (II), (III) (C).

 Id. at 393 (II) (A) (citations omitted).

 Supra.

 Douglas, supra at 357.

 Evitts, supra at 405 (III) (C) (punctuation and footnote omitted).

 Lassiter v. Dept. of Social Svcs. of Durham County, 452 U. S. 18, 24 (II) (101 SCt 2153, 68 LE2d 640) (1981).

 Id. at 31 (II) (C).

 285 Ga. 829 (686 SE2d 635) (2009).

 Id. at 834 (2) (citation omitted).

 Id.

 Santosky v. Kramer, 455 U. S. 745, 753-754 (II) (B) (102 SCt 1388, 71 LE2d 599) (1982) (citations and punctuation omitted).

 Ross, supra at 609-610 (III).

 See Evitts, supra at 400-401 (III) (A) (“The right to appeal would be unique among state actions if it could be withdrawn without consideration of applicable due process norms. For instance, although a State may choose whether it will institute any given welfare program, it must operate whatever programs it does establish subject to the protections of the Due Process *55 Clause. Similarly, a State has great discretion in setting policies governing parole decisions, hut it must nonetheless make those decisions in accord with the Due Process Clause. In short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution — and, in particular, in accord with the Due Process Clause.”) (citations omitted; emphasis supplied); Douglas, supra.

 See generally Rowland, supra at 873 (1) (“An attorney who through negligence, ignorance, or misinterpretation of the law . . . fails to perform routine duties resulting in a dismissal of his client’s appeal, thereby denying such client a right of review after conviction cannot be said to be rendering effective assistance. The result is the same as no assistance at all.”) (citation omitted).

 See In the Interest of A. C., supra; Rowland, supra at 875 (2) (“The out-of-time appeal is granted where the deficiency involves not the trial but the denial of the right of appeal----[A]n out-of-time appeal is the remedy for a frustrated right of appeal[.]”).

 In the Interest of D. R. E., 282 Ga. App. 529, 530 (639 SE2d 535) (2006) (citation and footnote omitted).

 The father of B. R. F. legitimated the child in October 2011.

 The grandfather had filed in superior court a petition to adopt B. R. F., and B. R. F.’s father surrendered his parental rights to DFCS.

 The juvenile court found that the biological father’s surrender of his parental rights was voluntarily given and not later revoked.

 OCGA § 15-11-94 (a) (2012).

 See OCGA § 15-11-94 (b) (4) (A) (i)-(iv) (2012).

 In the Interest of M. S. S., 308 Ga. App. 614, 620 (2) (708 SE2d 570) (2011) (citations and punctuation omitted).

 See In the Interest of J. S. B., 277 Ga. App. 660, 661 (2) (a) (627 SE2d 402) (2006).

 See In re A. R., 302 Ga. App. 702, 710 (1) (c) (691 SE2d 402) (2010) (“The test in determining termination of parental rights, ... is whether the mother, ultimately standing alone, is capable of mastering and utilizing the necessary skills to meet her parenting obligations.”) (citations, punctuation and footnotes omitted).

 See id. (“Finally, and perhaps most importantly, we note that even when construed in her favor, the testimony of the psychologist and the witnesses called to testify on the mother’s hehalf shows that the mother could parent the children only with some type of assistance.”); In the Interest of Z. H. T., 302 Ga. App. 424, 429 (1) (a) (691 SE2d 292) (2010) (“Where, as here, the children have been removed from parental custody, DFCS may prove current deprivation by showing that, if the children were returned to their mother at the time of the hearing, they would be deprived. This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing.”); In the Interest of H. F. G., 281 Ga. App. 22, 26-27 (1) (635 SE2d 338) (2006) (although the mother had completed most of her case plan goals and wished to be part of her child’s life, the evidence showed that she lacked the mental capacity to care for the child without “around-the-clock assistance from others,” something DFCS was not obligated to provide; given the mother’s mental capacity, her inability to care for her child by herself, and the fact that the child’s foster parents wished to adopt him, the juvenile court did not abuse its discretion in finding that termination of the mother’s parental rights served the best interests of the child).

 In the Interest of C. A. S., 308 Ga. App. 757, 760 (2) (708 SE2d 655) (2011).

 Id. (citation and punctuation omitted).

 Alizota v. Stanfield, 329 Ga. App. 550, 558 (765 SE2d 707) (2014) (punctuation and footnote omitted).

 See generally In the Interest of C. A. S., supra.

 In the Interest of A. R., supra at 710 (1) (c) (citations, punctuation and footnotes omitted).

 See OCGA § 15-11-94 (b) (4) (A) (iv) (2012).

 In the Interest of M. C. L., 251 Ga. App. 132, 136 (1) (b) (553 SE2d 647) (2001) (punctuation and footnotes omitted).

 In the Interest of A. E., 314 Ga. App. 206, 209 (2) (c) (723 SE2d 499) (2012) (citation and punctuation omitted).

 In the Interest of D. O. R., 287 Ga. App. 659, 663 (1) (iv) (653 SE2d 314) (2007).

 In the Interest of A. B., 274 Ga. App. 230, 232 (617 SE2d 189) (2005).

 In the Interest of T. J., 281 Ga. App. 673, 675-676 (1) (637 SE2d 75) (2006) (citations and punctuation omitted); see In the Interest of M. L. P., 236 Ga. App. 504, 510 (1) (d) (512 SE2d 652) (1999) (juvenile court has broad discretion in determining how the interest of the child is best served).

 See In the Interest of T. J., supra at 676 (1).

 Id. (citation and punctuation omitted).

 Id.; see In the Interest of A. E., supra at 210 (2) (d); In the Interest of D. O. R., supra at 663 (2).